UNITED STATES of America

v.

Howard L. CRIDEN, Harry P. Jannotti, Louis C. Johanson and George X. Schwartz

Howard L. Criden, Harry P. Jannotti and George X. Schwartz, Appellees.

In re Application of NATIONAL BROADCASTING COMPANY, INC., American Broadcasting Companies, Inc., CBS Inc. and Westinghouse Broadcasting Company, Inc., Appellants.

No. 80–2622.

United States Court of Appeals, Third Circuit.

Argued Jan. 15, 1981.

Decided April 20, 1981.

Richard A. Sprague, Edward H. Rubenstone (argued), Sprague, Goldberg & Rubenstone, Philadelphia, Pa., for appellee, George X. Schwartz.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

### I.

This is an appeal from the order of the district court denying the application of the television networks "for permission to copy, for the purpose of broadcasting·to the public, those video and audio tapes admitted into evidence and played to the jury in open court" during the criminal trial of two members of the Philadelphia City Council arising out of what has become known as the Abscam prosecutions. For the reasons set forth hereafter, we reverse the order of the district court.

### II.

Following a series of indictments returned by grand juries sitting in various districts of the country, a number of local, state and federal public officials were tried on charges of bribery and related offenses allegedly committed during the course of an FBI "sting" operation.[1] The trial of defendants, George X. Schwartz, then President of Philadelphia City Council, and Harry P. Jannotti, then a member of the Council, began September 15, 1980 in the Eastern District of Pennsylvania. The court had severed the trials of two co-defendants, Louis C. Johanson, another member of Philadelphia City Council, and Howard L. Criden, a Philadelphia attorney. Both Johanson and Criden had been convicted on similar charges in the United States District Court for the Eastern District of New York.

J. Marshall Wellborn, Ralph E. Goldberg, Allen Shaklan, Samuel Antar, Harlan Rosenzweig, Floyd Abrams (argued), Robert C. Meade, Devereux Chatillon, Melanie Lawson, Cahill Gordon & Reindel, New York City, Gregory Harvey, Morgan, Lewis & Bockius, Philadelphia, Pa., for appellants.

Richard Ben-Veniste, Washington, D. C., for appellee, Howard L. Criden.

J. Clayton Undercofler, III, Dilworth, Paxson, Kalish & Levy, Edward H. Rubenstone (argued), Philadelphia, Pa., for appellee, Harry P. Jannotti.

1. Many of the details of this operation can be found in the opinion of the Second Circuit in a similar appeal, see *In re Application of National Broadcasting Co.* (Myers), 635 F.2d 945, 947 (2d Cir. 1980), and in the opinion of the district court overturning the convictions of defendants Schwartz and Jannotti, *United States v. Jannotti*, 501 F.Supp. 1182 (E.D.Pa.1980).

Prior to commencement of the trial, representatives of the three major television networks, NBC, ABC and CBS, and Westinghouse Broadcasting, Inc., which owns and operates a Philadelphia television and radio station, (hereafter jointly referred to as "broadcasters") requested permission to copy the audio and videotapes introduced into evidence for broadcasting to the public. The court released transcripts of the tapes to the press and public, but denied the broadcasters' request to copy the tapes themselves on September 8, 1980. Among the reasons given for the denial were the pendency of a similar appeal before the Second Circuit in an Abscam case where the district court had ordered that the tapes be released to the press, the pendency of the Schwartz-Jannotti trial, the outstanding indictments of defendants Johanson and Criden, and the existence of substantial due process challenges to the indictments.

The broadcasters renewed their application for the tapes on October 16, 1980, citing several changes in circumstances. First, a unanimous panel of the Second Circuit had affirmed the district court's release of the tapes in the New York Abscam trial, *In re Application of National Broadcasting Co. (Myers)*, 635 F.2d 945 (2d Cir. 1980), and the Supreme Court refused to stay that order, —— U.S. ——, 101 S.Ct. 261, 66 L.Ed.2d 125 (1980). Consequently, the tapes introduced at that trial were in fact broadcast to the public. In addition, the Schwartz-Jannotti trial had concluded with guilty verdicts against both defendants although the indictments of Criden and Johanson were still outstanding in this district. After reconsideration of its decision in light of these intervening developments, the district court again denied the broadcasters' application. *United States v. Criden*, 501 F.Supp. 854 (E.D.Pa.1980). This expedited appeal followed.

The district court, stating that the only issues implicated were those relating to the common law right of access to judicial records, stressed that "the decision as to access to trial evidence is committed to the discretion of the trial court." *Id.* at 857, *citing Nixon v. Warner Communications, Inc.*, 435

U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). The court found itself in "total disagreement" with the decisions of the courts of appeals for the District of Columbia and Second Circuit which espoused an "expansive view of the common law right of access." 501 F.Supp. at 857, 859. *Compare In re Application of National Broadcasting Co. (Myers), supra; United States v. Mitchell*, 551 F.2d 1252, 1258 (D.C.Cir. 1976), *rev'd on other grounds sub nom. Nixon v. Warner Communications*, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). The district court found no support for that view in the Supreme Court's decision in *Warner Communications*. The district court concluded, however, that "whatever the force of the presumption [in favor of disclosure], I am ... convinced that the circumstances of the present case are indeed sufficiently extraordinary to require denial of the broadcasters' application." 501 F.Supp. at 859.

The factors referred to by the court in support of denial of the application were "the very great difference between videotape evidence and other forms of evidence," *id.*; the "penalties not prescribed by the law [which] will be visited upon the accused and, more importantly, upon innocent relatives and friends" by more widespread publicity, *id.* at 860; and the difficulty which the broadcasting would create in selecting a jury for the then still pending trial of Criden and Johanson and in the event of a retrial of Schwartz and Jannotti. *Id.* at 861. The court referred to several additional reasons, which were the possibility that its ruling admitting the tapes into evidence was incorrect, the showing in the Schwartz-Jannotti trial of videotapes which would be prejudicial and inadmissible as to Criden, the inclusion of "scurrilous and libelous statements about third parties," and the prohibition imposed on televising courtroom proceedings by resolution of the Judicial Conference of the United States, which the district court analogized to release of videotapes. *Id.* at 862–64.

On appeal the broadcasters contend that the district court failed to accord proper weight to the presumption of access and that it relied on improper factors in assess-

ing the weight of the defendants' interests against release. Essentially the broadcasters would have us adopt the standard articulated in *In re Application of National Broadcasting Co.* (Myers), 635 F.2d at 952, that only the "most extraordinary circumstances" could overcome the presumption in favor of release, or, as phrased in *United States v. Mitchell*, 551 F.2d at 1261, that the party opposing exercise of the common law right of access would have the burden of showing "that justice required denying access to the court records." Additionally, the broadcasters contend that the district court's characterization of publicity as punishment is clearly wrong and that its concerns about the availability of an unbiased jury in the event of a retrial were unwarranted based on the experiences of other courts in securing acceptable juries in highly publicized cases and the effectiveness of voir dire as a means of identifying and excluding unacceptable jurors. With regard to the disputed admissibility of the tapes, the broadcasters contend that the district court was correct in its initial ruling and, alternatively, that defendants' objections to the tapes were essentially premised on privacy interests which have already been decided adversely to them by virtue of the tapes having been publicly shown in court. Release of the audio and videotapes is opposed by Schwartz and Jannotti whose argument tracks the reasoning of Judge Fullam in denying the broadcasters' application.[2]

## III.

### A.

### *Review of Discretion*

The broadcasters concede that there is no constitutional right to copy the tapes and that even under the common law right on which they rely, there is no absolute right to release of the tapes. Since all parties agree that release of the tapes is a matter committed to the discretion of the trial court, we must first consider our scope of review.

The mere statement that a decision lies within the discretion of the trial court does little to shed light on its reviewability. It means merely that the decision is uncontrolled by fixed principles or rules of law. *See* Rosenberg, *Judicial Discretion of the Trial Court, Viewed from Above*, 22 Syracuse L.Rev. 635, 636–43 (1971). *See also* material compiled in R. Aldisert, *The Judicial Process* 742–76 (1976). In our judicial system, a wide variety of decisions covering a broad range of subject matters, both procedural and substantive, is left to the discretion of the trial court. The justifications for committing decisions to the discretion of the court are not uniform, and may vary with the specific type of decisions.[3] Although the standard of review in such instances is generally framed as "abuse of discretion," in fact the scope of review will be directly related to the reason why that category or type of decision is committed to the trial court's discretion in the first instance.

Perhaps the most common category of decisions committed to the discretion of the trial court encompasses those situations where the decision depends on first-hand observation or direct contact with the litigation. Only the trial judge has seen the witness or observed the jury's reaction to evidence. Only the trial judge has supervised the course of litigation through dis-

---

2. Counsel for Criden joined in the Schwartz-Jannotti brief by letter to the court.

3. Professor Maurice Rosenberg, in analyzing the forms of discretion and their underlying rationale, categorizes the meanings and uses of judicial discretion into two groups, primary and secondary types of discretion. Rosenberg, *Judicial Discretion of the Trial Court, Viewed from Above*, 22 Syracuse L.Rev. 635, 636–43 (1971). He defines primary type discretion as "decision-making discretion" to signify that the adjudicator is "free from the constraints which characteristically attach whenever legal rules enter the decision process." *Id.* at 637. The secondary type discretion is a "review-restraining concept," *id.*, which is established when the appellate courts, through self-limitation, give the trial court's determination "a status or authority that makes it either unchallengeable, or challengeable to only a restricted degree." *Id.* at 641.

covery and pretrial, and can evaluate the diligence or procrastination of the attorneys. In those circumstances the trial court has a superior vantage point which an appellate court cannot replicate. The trial court's decision therefore merits a high degree of insulation from appellate revision. Rulings on evidentiary matters, discovery, and procedural issues fall in this category.

On the other hand, discretion is sometimes committed to the trial judge because of pragmatic considerations. When circumstances are either so variable or so new that it is not yet advisable to frame a binding rule of law, trial courts may be given discretion until the factors important to a decision and the weight to be accorded them emerge from the montage of fact patterns which arise. *See* Rosenberg, *supra*, at 662–63. Often, in time, the contours of a guiding rule or even principle may develop as the courts begin to identify the policies which should control. Thus, for example, although the selection of an appropriate remedy has been generally deemed to lie in the equitable discretion of the trial judge, after experience has accumulated the appellate courts may decide that a specific remedy should be awarded as a general rule. *See, e. g., Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418–19, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975) (presumptive right to a backpay order as a remedy for unlawful discrimination). Similarly, award of attorney's fees is generally conceded to lie in the discretion of the trial court but such discretion has been restricted as the factors to be considered are identified and as guidelines are developed. *See, e. g., Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161 (3d Cir. 1973).

Commitment to discretion implicates conflicting policy considerations. On one hand, commitment to discretion vests the adjudicator with the flexibility necessary to fit the decision to the individualized circumstances. On the other hand, there are countervailing considerations that militate against an expansive delegation of discretion to the trial court. Among the more persuasive reasons for caution is the concern that commitment to discretion may be antithetical to consistency of treatment, a major ingredient of justice. *See* K. Davis, *Discretionary Justice: A Preliminary Inquiry* 107 (1969). Similarly, there is a disturbing lack of predictability about the results of discretionary decisions. *See id.* at 29–33. Additionally, "unreviewable discretion offends a deep sense of fitness in our view of the administration of justice." Rosenberg, *supra*, at 641–42. There is a general feeling that the losing litigant should not be deprived of at least one opportunity for review of each significant ruling made by a single judge. *Id.* at 642. Thus, where the basis for commitment of a decision to a trial court's discretion is not dependent on its observation or familiarity with the course of the litigation, there are less compelling reasons for limited appellate review.[4]

In the matter before us on this appeal, the decision whether to release the tapes was not dependent in the main on particular observations of the trial court. Therefore, the trial court's decision is not accorded the narrow review reserved for discretionary decisions based on first-hand observations, and we must consider both the relevance and weight of the factors considered. Our review is facilitated because Judge Fullam clearly and succinctly expressed the bases for his decision denying release.

4. Not all matters committed to the trial court's discretion fall within the groupings discussed above. For example, sentencing decisions are left to the trial court's discretion with almost no substantive appellate review even though the decision is often made on the basis of factors other than the trial court's personal observation. *See generally* Korbakes, *Criminal Sentencing: Should the "Judge's Sound Discretion" be Explained?* 59 Judicature 185, 187 (1975) (noting that factors relied upon by sentencing judges include portions of the trial record and presentence report); Labbe, *Appellate Review of Sentences: Penology on the Judicial Doorstep,* 68 J. Crim.L. & Criminology 122, 132 (1977) (proponents of sentence review argue that many cases in which sentences are imposed are disposed of by guilty pleas and trial judge has "little or no opportunity for first hand observation of the defendant").

We note that until or unless guiding rules have become fixed, it is important that the exercise of discretion be accompanied by the trial court's articulation of the factors considered and the weight accorded to them, as was done in this case. Superficially, it might appear that such an articulation would encourage appellate revision while an unarticulated decision might evade review. In fact, however, articulation of the reasons for the decision tends to provide a firm base for an appellate judgment that discretion was soundly exercised. It confines review of the exercise of discretion to its appropriate scope—*i. e.*, whether the relevant factors were considered and given appropriate weight—and discourages reversal on the ground that the appellate judges might have decided differently had they been the original decisionmakers. We turn then to consideration of the relevant factors.

### B.

### *Factors Favoring Release*

Chief among the factors favoring release is the common law right of the public to inspect and copy judicial records. The existence of such a right was recognized by the Supreme Court in *Warner Communications*, where the Court stated:

> It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents.

435 U.S. at 597, 98 S.Ct. at 1312.

The right to inspect and copy, sometimes termed the right to access, antedates the Constitution. *United States v. Mitchell*, 551 F.2d at 1260. It has been justified on the ground of the public's right to know, which encompasses public documents generally, and the public's right to open courts, which

has particular applicability to judicial records. *Crystal Grower's Corp. v. Dobbins*, 616 F.2d 458, 461 (10th Cir. 1980); *Cohen v. Everett City Council*, 85 Wash.2d 385, 535 P.2d 801 (1975); *United States v. Burka*, 289 A.2d 376, 379–80 (D.C.App.1972).[5] *See* Comment, *All Courts Shall Be Open: The Public's Right to View Judicial Proceedings and Records*, 52 Temp.L.Q. 311, 337–40 (1979).

The Second Circuit, in discussing the nature of the interest which favored disclosure of the Abscam videotapes, stated:

> Though the transcripts of the videotapes have already provided the public with an opportunity to know what words were spoken, there remains a legitimate and important interest in affording members of the public their own opportunity to see and hear evidence that records the activities of a Member of Congress and local elected officials, as well as agents of the Federal Bureau of Investigation. And there is a significant public interest in affording that opportunity contemporaneously with the introduction of the tapes into evidence in the courtroom, when public attention is alerted to the ongoing trial. *Cf. Richmond Newspapers, Inc. v. Virginia, supra* closed courtroom not justified despite prompt release of "tapes" of the trial after its conclusion, 448 U.S. 555 at 562 n.3, 100 S.Ct. 2814, at 2820 n.3, 65 L.Ed.2d 973; *Nebraska Press Assn. v. Stuart, supra*, 427 U.S. [539] at 560–61, [96 S.Ct. 2791 at 2803–04, 49 L.Ed.2d 683].

*In Re Application of National Broadcasting Co. (Myers)*, 635 F.2d at 952.

In *Warner Communications*, the Supreme Court considered an appeal from the decision of the Court of Appeals for the District

---

5. In *United States v. Cianfrani*, 573 F.2d 835 (3d Cir. 1978), we held that it was unconstitutional to exclude the public from pretrial suppression hearings. The majority opinion, authored by Chief Judge Seitz, relied on the Sixth Amendment. Judge Gibbons concurred, relying instead on "the federal common law implied from the first amendment." *Id.* at 862. Shortly thereafter the Supreme Court decided in *Gannett Co. v. DePasquale*, 443 U.S. 368, 99

S.Ct. 2898, 61 L.Ed.2d 608 (1979), that the Sixth Amendment which guarantees the accused the right to a public trial does not confer upon representatives of the press or members of the general public any right of access to pretrial suppression hearings. The Court left open the question whether the First and Fourteenth Amendments afford such a right. *Id.* at 391–93, 99 S.Ct. at 2911–12.

of Columbia ordering the release to the media of audiotapes of conversations of President Nixon which had been subpoenaed in connection with the Watergate proceedings. In reaffirming the existence of the right to inspect and copy judicial records, the Court did not attempt to rationalize its underlying basis. However, in contrasting the English decisions which require showing of a particular interest with the American decisions which "generally do not condition enforcement of this right on a proprietary interest in the document or upon a need for it as evidence in a lawsuit," the Court stated:

The interest necessary to support the issuance of a writ compelling access has been found, for example, in the citizen's desire to keep a watchful eye on the workings of public agencies, see, e. g., *State ex rel. Colscott v. King*, 154 Ind. 621, 621–627, 57 N.E. 535, 536–538 (1900); *State ex rel. Ferry v. Williams*, 41 N.J.L. 332, 336–339 (1879), and in a newspaper publisher's intention to publish information concerning the operation of government, see, e. g., *State ex rel. Youmans v. Owens*, 28 Wis.2d 672, 677, 137 N.W.2d 470, 472 (1965), modified on other grounds, 28 Wis.2d 685a, 139 N.W.2d 241 (1966). But see *Burton v. Reynolds*, 110 Mich. 354, 68 N.W. 217 (1896).

435 U.S. at 597–98, 98 S.Ct. at 1311–12.

Because Congress had enacted a statute governing the procedure for release and access of the Nixon papers, including the tapes in question, the Court in *Warner Communications* did not undertake to balance the strength of the common law right to view judicial records against the interests pressed by defendants, which it viewed as the procedure to be followed in ruling on a request for access. The Court also rejected the broadcasters' claim that release of the Watergate tapes was required by either the First Amendment guarantee of freedom of the press or the Sixth Amendment guarantee of a public trial, *id.* at 608–10, 98 S.Ct. at 1317–18, an issue the broadcasters do not raise here. Nonetheless, the interests identified by the Court in *Warner Communications* as supporting the right to ac-

cess, "the citizen's desire to keep a watchful eye on the workings of public agencies" and publication of "information concerning the operations of government," are identical to the interests identified in the subsequent decision in *Richmond Newspapers, Inc. v. Virginia,* —— U.S. ——, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), where the Court held for the first time that the public's access to criminal trials is guaranteed by First Amendment. Although we do not consider the applicability of the First Amendment here, we believe that some of the same policy considerations identified as supporting open trials may be considered when the issue involves the common law right of access to trial materials.

In *Richmond Newspapers*, the plurality opinion written by Chief Justice Burger for three members of the Court traced the criminal trial from the days before the Norman Conquest, when attendance at trials was compulsory for freemen who were required to render judgment, through its evolution in England and the American colonies to contemporary times. The characteristic which remained constant in this development was the openness at the proceedings to those who wished to attend a criminal trial. *Id.* at 2821–23.

Chief Justice Burger found that the importance of openness lay not only in the interests of the defendant but also in the interests of the public. He stated that "[t]he early history of open trials in part reflects the widespread acknowledgment, long before there were behavioral scientists, that public trials *had significant community therapeutic value*" (emphasis added) and that "especially in the administration of justice, the means used to achieve justice must have the support derived from public acceptance of both the process and its results." *Id.* at 2824. In stressing the "important prophylactic purpose" served by the "open processes of justice" in "providing an outlet for community concern, hostility, and emotion," the Chief Justice continued:

Civilized societies withdraw both from the victim and the vigilante the enforcement of criminal laws, but they cannot

erase from people's consciousness the fundamental, natural yearning to see justice done—or even the urge for retribution. The crucial prophylactic aspects of the administration of justice cannot function in the dark; no community catharsis can occur if justice is "done in a corner [or] in any covert manner." .... It is not enough to say that results alone will satiate the natural community desire for "satisfaction." A result considered untoward may undermine public confidence, and where the trial has been concealed from public view an unexpected outcome can cause a reaction that the system at best has failed and at worst has been corrupted. To work effectively, it is important that society's criminal process "satisfy the appearance of justice," *Offutt v. United States*, 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954), and the appearance of justice can best be provided by allowing people to observe it.

*Id.* 100 S.Ct. at 2824–25.

Justice Brennan, joined by Justice Marshall, wrote separately, stressing the "*structural* role" played by the First Amendment "in securing and fostering our republican system of self-government." He explained that:

> Implicit in this structural role is not only "the principle that debate on public issues should be uninhibited, robust, and wide-open," *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964), but the antecedent assumption that valuable public debate—as well as other civic behavior—must be informed. The structural model links the First Amendment to that process of communication necessary for a democracy to survive, and thus entails solicitude not only for communication itself, but for the indispensable conditions of meaningful communication.

*Id.* 100 S.Ct. at 2833 (footnotes omitted).

Turning next to the importance of public access to the trial process itself, Justice Brennan, like Chief Justice Burger, found that open trials play a fundamental role beyond that of assuring the criminal defendant a fair and accurate adjudication of guilt or innocence. Among "other, broadly political, interests" advanced by the trial process is the need to demonstrate to the citizenry the fairness of the law. *Id.* at 2837. "Open trials assure the public that procedural rights are respected, and that justice is afforded equally.... Public access is essential, therefore, if trial adjudication is to achieve the objective of maintaining public confidence in the administration of justice." *Id.* Furthermore, for Justice Brennan, a trial implicates one of the branches of government, and therefore the conduct of the trial "is preeminently a matter of public interest" because the knowledge that it " 'is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power,' " *id.* at 2838, *quoting In re Oliver*, 333 U.S. 257, 270, 68 S.Ct. 499, 506, 92 L.Ed. 682 (1948). *See generally The Supreme Court, 1979 Term*, 94 Harv.L.Rev. 149–59 (1980).

The factors emphasized by both opinions, which jointly commanded a majority of the votes of the Court, are equally significant to the issue before us. We need not speculate on whether the *Richmond Newspapers* case betokens a more expansive view of the First Amendment's application to the right to copy evidence introduced at trial than was followed by the Court in *Warner Communications* two years before,[6] but we believe the analyses in *Richmond Newspapers* of the public's right to an open trial provide

---

**6.** Arguably, the *Richmond Newspapers* case could be viewed as supporting a right of the *public* to access to the tapes through the medium of the broadcasters. The only First Amendment right rejected in *Warner Communications* was that possessed by the *press*. The Court stated that "[t]he First Amendment generally grants the press no right to information about a trial superior to that of the general public," 435 U.S. at 609, 98 S.Ct. at 1318, but did not discuss the nature of the right, if any, of the general public under the First Amendment. In view of our disposition of this case on nonconstitutional grounds, we need not decide whether there remains any room for a constitutional right based on the First Amendment as construed in *Richmond Newspapers*.

strong support for reliance on the common law right of access to trial materials in this case.

We recognize that an application to copy evidence for the purpose of dissemination, such as that made by the broadcasters here, does not present the precise issue raised in cases where the issue was the public's right to attend open trials or to inspect judicial records. In the proceedings below, the trial was open, the audio and videotapes were publicly played, and the broadcasters as well as other representatives of the news media were provided with a transcript which they were free to disseminate without limitation. The issue before us focuses instead on the right to rebroadcast evidence already publicly available in the same form as that viewed by those present at the trial. Nonetheless, broader dissemination would serve the same values of "community catharsis," observation of the criminal trial process, and public awareness served by the open trial guarantee.

In exploring the news media's fair report privilege in an action for libel, we recently commented on the value of public supervision and inspection of courtroom proceedings, and the public's interest in learning of important matters. *See Medico v. Time, Inc.*, No. 79–00597, 643 F.2d 134 at 140–142 (3d Cir. 1981). These same interests favor broad dissemination of the actual evidence introduced in judicial proceedings.

Finally, we note that the criminal trial at which the tapes were played was not an ordinary criminal trial. The two defendants tried were elected public officials accused of receiving money for acts to be performed by them because of their official positions. The Abscam indictments have provoked public concern and comment about the morality of public officers. The

government's involvement in the conduct for which defendants were prosecuted has raised sensitive issues of public policy, since the integrity of the methods used in federal law enforcement has been called into question. Subsequent to the trial and the ruling on the tapes, Judge Fullam held that the conduct of the undercover agents established entrapment which entitled defendants to judgments of acquittal. *United States v. Jannotti*, 501 F.Supp. 1182, 1200 (E.D.Pa.1980). The actions of the indicted elected officials, the conduct of the law enforcement agencies, and the court's decision to set aside the convictions combine to create legitimate public interest in the proceedings far beyond the usual criminal case.

The public's opportunity to observe the trial proceeding, secured by *Richmond Newspapers*, is subject to certain practical limitations, and can be taken advantage of only by those persons who have the available time and means to be present. Thus, the public forum values emphasized in that case can be fully vindicated only if the opportunity for personal observation is extended to persons other than those few who can manage to attend the trial in person. All of the foregoing factors favor permitting rebroadcast of the evidence produced at the trial for wider dissemination.

■ The district court indicated a great reluctance to find a presumption that evidence produced at trial should be made available to the broadcasters in a form that will permit its observation by the public at large. The court saw no justification for a very strong presumption in favor of permitting copying and re-dissemination by the broadcasters,[7] stating it was "quite impossible to derive from the Supreme Court's [*Warner Communications*] decision any support for the expansive view of the com-

---

7. The broadcasters argue that the district court erroneously refused to follow "controlling court of appeals decisions." In a recent decision, we commented on the precedential force of decisions of other circuits. In *Heverly v. C.I.R.*, 621 F.2d 1227, 1236 (3d Cir. 1980), Judge Aldisert, speaking for the court, stated, "other decisions relevant to this issue are not controlling precedents in this circuit, but are influential to

the extent that their reasoning is persuasive." We believe the district court articulated the proper standard when it stated, "[t]he decision of a circuit court of appeals which is squarely apposite is entitled to the utmost respect, notwithstanding the fact that it emanates from another circuit and is therefore not totally binding upon this Court." 501 F.Supp. at 856.

mon law right of access espoused by the Second Circuit and the D.C. Circuit Court of Appeals...." 501 F.Supp. at 859. The district court believed that existence of a presumption was refuted by references in *Warner Communications* to "the crucial fact that [the broadcasters] require a court's cooperation in furthering their commercial plans" and the need for "a sensitive appreciation of the circumstances that led to [the] production" of the tapes. 435 U.S. at 602–03, 98 S.Ct. at 1314–15. We view this language in *Warner Communications* as addressed to the circumstances that led to the production of the Watergate tapes in court, a third party subpoena vigorously contested by the President of the United States. Unlike the district court, we read the *Warner Communications* decision as supportive of a presumption of release of the tapes, because the only circumstances referred to there which would militate against production were use of subpoenaed material as "a vehicle for improper purposes." 435 U.S. at 598, 98 S.Ct. at 1312. In any event, when the common law right of access is buttressed by the significant interest of the public in observation, participation, and comment on the trial events, we believe that the existence of a presumption of release is undeniable. Obviously, the strength of the presumption can be effectively considered only in relationship to the factors which would justify denial of the application. However, in order to avoid ambiguity, we hold that there is a strong presumption that material introduced into evidence at trial should be made reasonably accessible in a manner suitable for copying and broader dissemination.

### C.

*Factors Relied On By The District Court*

1. *The Nature of Videotape Evidence*

The district court stated that "whatever the force of the presumption, I am also convinced that the circumstances of the present case are indeed sufficiently extraordinary to require denial of the broadcasters' application." 501 F.Supp. at 859. The district court emphasized as its first point "the

very great difference between videotape evidence and other forms of evidence." *Id.* The court explained that "[t]he viewer of videotape becomes virtually a participant in the events portrayed." *Id.* at 860.

In considering whether the nature of the videotape evidence is a factor that might reasonably be relied on to justify denial of an application to copy evidence, it is necessary to bear in mind that generally the right to copy has been considered to be correlative to the right to inspect. As copying techniques grew more sophisticated, the courts adjusted the common law right to include the right to copy public records by mechanical means. *In Moore v. Board of Freeholders of Mercer County*, 76 N.J.Super. 396, 408, 184 A.2d 748, 754 (Super.Ct. App.Div.1962), the court stated:

We come, then, to the core question of whether the common law right which persons like plaintiffs have, to inspect and copy public records, is limited to hand-copying. Plaintiffs seek to photocopy by the use of modern tested equipment, portable and compact, and well known in the public market. To ignore the efficacy and practical worth of such equipment, and to compel plaintiffs to resort to laborious and time-consuming hand-copying, would substantially impair their right to inspect and copy.

To prohibit photocopying with proper equipment is to ignore the significant progress which our generation has witnessed. Photocopying is an everyday procedure in business and professional offices, large and small. Plaintiffs cannot be restricted to the use of pen, pencil and pad. Were we to accept the reason defendants advance for denying the right to photocopy, then it might well be said that a records custodian in some past day could, with equal justification, have insisted that the interested citizen use quill instead of pen, or pen instead of typewriter.

The only limitations upon the use of photocopying equipment must be that such equipment does not occupy an unreasonable amount of working space or

unreasonably interfere with the regular routine of the office involved, and that its performance be such as not to damage or impair the physical records themselves or their contents.

The district court appears to have been particularly concerned because rebroadcast of the videotape evidence would cause "dissemination of powerfully convincing evidence beyond the confines of the trial arena ..." 501 F.Supp. at 860. There can be no question that actual observation of testimony or exhibits contributes a dimension which cannot be fully provided by second-hand reports. As the court stated in *Oxnard Publishing Co. v. Superior Court of Ventura County*, 68 Cal.Rptr. 83, 95 (Ct. App.1968):

> Important, sometimes vital, parts of the trial, including the appearance, demeanor, expression, gestures, intonations, hesitances, inflections, and tone of voice of witnesses, of counsel, and of the judge are not there. In the absence of public attendance a substantial part of the real record of the proceeding will have been permanently lost to public scrutiny.

However, such publicity, rather than favoring rejection of the application, may in fact support its grant, absent compelling reasons to the contrary. Chief Justice Burger recognized that in the practicalities of information dissemination in contemporary American life, "[i]nstead of acquiring information about trials by firsthand observation or by word of mouth from those who attended, people now acquire it chiefly through the print and electronic media. In a sense, this validates the media claim of functioning as surrogates for the public." *Richmond Newspapers*, 100 S.Ct. at 2825. Replication of the trial court experience may contribute to the public's understanding of the events which were the subject of the trial proceedings, and thereby enhance its "comprehension of the functioning of the entire criminal justice system ..." *Id., quoting Nebraska Press Association v. Stuart*, 427 U.S. 539, 587, 96 S.Ct. 2791, 2816, 49 L.Ed.2d 683 (1976) (Brennan, J., concurring).

*2. Rebroadcast as Enhanced Punishment*

■ The district court placed great emphasis on the effect of publicity which rebroadcast would cause defendants. The court recognized that publicity was one of the unavoidable impacts of the criminal justice system upon persons whose activities subject them to criminal charges. The court then stated:

> The greater and more widespread the publicity about a particular criminal case, the more likely it is that penalties not prescribed by the law will be visited upon the accused and, more importantly, upon innocent relatives and friends....
>
> Given the nature of our society these side effects are inevitable; indeed, it can be argued that they form an important, if unofficial, part of the sanctions imposed by society upon lawbreakers. The unfortunate fact is, however, that these side effects are not uniformly visited upon persons accused of violating the law. And, since they are not an official part of the criminal justice process, and are beyond the reach of that process, there is probably no acceptable way of ensuring uniformity of application.

501 F.Supp. at 860.

There are several distinct threads running through the district court's discussion which merit separate analysis. All of the courts which have considered applications for copying tapes have iterated that there are certain circumstances which justify denial of the application. Primarily, as noted by the Supreme Court, denial is justified to prevent court files from becoming a vehicle for improper purposes. *Warner Communications*, 435 U.S. at 598, 98 S.Ct. at 1312. The illustrations given by the Court of such "improper purposes" were use of records "to gratify private spite or promote public scandal" through publication of the "painful and sometimes disgusting details of a divorce case"; to facilitate distribution of libelous statements; and to harm a litigant's competitive standing by distribution of business information. *Id.* The Court's illustrations are most aptly directed to applications for initial access, since the attend-

ant publicity following access by the press to the information cannot be prevented. *See Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 491–497, 95 S.Ct. 1029, 1044–1047, 43 L.Ed.2d 328 (1975).

Even when initial access is unavoidable, as in the case of trial evidence, there are instances where the right to copy evidence already made public has been denied pursuant to the court's power to prevent use of evidence for improper purposes. For example, in *In re Application of KSTP Television*, 504 F.Supp. 360 (D.Minn. Dec. 1, 1980), the court denied the application of a television station to copy videotapes made by the defendant which recorded conversations and conduct preliminary to and anticipatory of his rape of one of his kidnapping victims. Although this evidence had been shown in the courtroom, and transcripts were furnished to the media, the court denied the application to permit copying of the tapes themselves because further broadcast would support sensationalism, would not serve the public interest, and "would impinge upon the precious privacy rights of . . . the unfortunate victim of the crime, and would lend the court's approval to the commercial exploitation of a voice and photographic display catering to prurient interests without proper public purpose or corresponding assurance of public benefit." *Id.*, at 362 (footnote omitted).

We believe there is a vast difference between republication which would intensify the pain already inflicted on an innocent victim of a crime, as in the *KSTP* case, and the additional publicity which would affect defendants who are themselves charged with commission of a crime. In this case, particularly, when the defendants themselves were public figures and their conduct was already the subject of national publicity and comment, we find the district court's concerns about the incremental effect of rebroadcast publicity to be unconvincing. The glare of publicity that may follow rebroadcast of the activities of these defendants cannot be compared with that which might lead a court to shield "children, vic-

tims of sex crimes, some informants, and even the very timid witness or party." *Chandler v. Florida*, —— U.S. ——, ——, 101 S.Ct. 802, 811, 66 L.Ed.2d 740 (1981).

Nor can we accept the court's strained analogy of rebroadcast to "parading a convicted defendant through the streets, or holding him up to public ridicule by exhibiting him in a cage or in the stocks." 501 F.Supp. at 860. The application at issue seeks only to rebroadcast evidence actually introduced at trial which has already passed the trial court's scrutiny for relevance. In *Chandler*, the Supreme Court held that the television coverage of a criminal trial for public broadcasting over the defendant's objection does not per se violate the due process clause. Similarly, the publicity consequent to rebroadcast of some of the evidentiary material introduced at trial will not, in itself, violate accepted notions of the decent administration of justice.

Members of the criminal defense bar, amici in the *Chandler* case, presented an argument which proceeded on a basis similar to the "enhanced punishment" idea accepted by the district court in this case. They raised the concern that coverage of select cases "singles out certain defendants" and that the broadcasters' selection will be governed by such facts as the nature of the crime and the status and position of the accused. The Court stated that "[t]he unanswered question . . . whether electronic coverage will bring public humiliation upon the accused with such randomness that it will evoke due process concerns" was "far from trivial," but that the answer must "await the continuing experimentation." *Id.* at ——, 101 S.Ct. at 813. Rebroadcast on television of audio and videotapes of a trial already completed is far less likely than concurrent broadcast of trial proceedings to create a circus or stadium atmosphere. Therefore, without any evidence to the contrary, we believe that such rebroadcast cannot appropriately be considered to be enhanced punishment of the defendants.[8]

---

8. In *Chandler v. Florida*, the Court stated that "The concurring opinion of Chief Justice War-

ren joined by Justices Douglas and Goldberg in *Estes* can fairly be read as viewing the very

No suggestion has been made in this case that the broadcasters are motivated by any improper purpose. While representatives of the media may not have any superior right to access than does the general public, they serve the public interest in communication of information. They have the facilities which will permit the dissemination of audio and videotape evidence to members of the public who were not present at the trial proceedings. The fact that there will be a congruence between information-receiving interests of the public and the commercial interests of the broadcasters in this instance does not thereby taint the broadcasters' request. *See United States v. Mitchell*, 551 F.2d at 1265.

### 3. *Risk of Infringement of Defendants' Rights to Fair Trial*

The most serious factor considered by the district court in its conclusion that the tapes should not be released was its finding that "release of the tapes at this time would seriously jeopardize the fair trial rights of the defendants." 501 F.Supp. at 861. Although the trials of Schwartz and Jannotti had been completed, the court found that the possibility of a retrial was not purely speculative and referred to the fact that the initial trials of Johanson and Criden had not yet taken place in this district. The court reasoned that despite "the vast amount of publicity which had already been accorded to this case, there remains a possibility that an untainted jury may yet be obtainable," but found that "the heightened publicity which would attend broadcasting of the actual tapes, and ... the vastly enhanced impact of the tapes themselves [would

make it] much less likely that a truly impartial jury could be obtained" for the future trials. *Id.*

After the district court's decision on October 22, 1980, several relevant events have intervened. We have been advised that the government has filed motions with the district court seeking dismissal of the indictments against both defendant Criden and Johanson, and that these motions to dismiss are unopposed.[9] Although no action on these motions has yet been taken by Judge Fullam, and we express no opinion with respect to them, we are, of course, aware that such unopposed motions are rarely denied, and therefore a future trial against Criden and Johanson in this district on these charges, while not impossible, is unlikely. Furthermore, on November 26, 1980, Judge Fullam "with great reluctance" set aside the convictions of both Schwartz and Jannotti after concluding that the evidence at trial established entrapment as a matter of law, and, in the alternative, that the defendants were entitled to judgments of acquittal "on the ground of governmental overreaching amounting to a violation of due process of law" or on the ground "that the circumstances relied upon to establish federal jurisdiction over the offenses charged were artificially created by the government in an attempt to exceed the proper scope of federal law enforcement." *United States v. Jannotti*, 501 F.Supp. at 1205.

Judge Fullam's ruling with regard to Schwartz and Jannotti does not obviate all possibility of a retrial. That ruling has been appealed by the government. If it is not sustained, defendants will undoubtedly

broadcast of some trials as potentially a form of punishment in itself—a punishment before guilt. This concern is far from trivial." —— U.S. at ——, 101 S.Ct. at 812. In *Chandler* as in *Estes* there was apprehension that "trials would be selected for television coverage for reasons having nothing to do with the purpose of trial." *Estes v. Texas*, 381 U.S. 532, 576, 85 S.Ct. 1628, 1649, 14 L.Ed.2d 543 (1965) (Warren, C. J., concurring). Chief Justice Warren's concern was directed to the possibility that a petitioner who "has attracted the public interest would find his trial turned into a vehicle for

television," which would affect the impartiality of the jury and the fairness of the trial proceedings. *Id.* at 576–77, 85 S.Ct. at 1649–50. There is nothing in Chief Justice Warren's concurring opinion which would support the district court's view of publicity as "enhanced punishment" unrelated to the fairness of the trial proceedings themselves.

9. Letter from Edward H. Rubenstone dated January 29, 1981, to the Clerk of the Court, following oral argument in this case.

seek to have their jury conviction overturned for alleged trial errors. Thus, there remains the possibility that Schwartz and Jannotti may have to be tried again in this district, and the effect of rebroadcast of the audio and videotapes on a possible future jury cannot be summarily dismissed.

Considerations of the effect of publicity on a jury are ordinarily matters on which the trial court's judgment is entitled to considerable deference by an appellate court. The trial court has already supervised the selection of one jury and any particular problems which the news coverage in this highly publicized matter created for the selection process would have come to the trial court's attention. Therefore, if the trial court had already experienced difficulty in jury selection, we would be faced with an actual rather than conjectural factor militating against release of the tapes for rebroadcast. However, the trial court's experience was the contrary. The court stated that "while virtually all of the prospective jurors called in the Schwartz and Jannotti case had heard or read about the case, most were able to state, truthfully in my view, that their awareness of the case was somewhat vague, and that they had formed no lasting conclusions concerning the guilt or innocence of the defendants." 501 F.Supp. at 861. Accordingly, the danger to defendants' fair trial rights on a possible retrial is not based on the trial court's experience in this case, but rather on its conjecture about possible future difficulties. In fact, other district judges sitting in related Abscam trials have also concluded that the publicity which would attend release of Abscam tapes would not rise to such a level as to imperil defendants' due process rights. *See United States v. Thompson*, 80 Crim. 291 (E.D.N.Y. Nov. 10, 1980) (order granting applications to copy); *United States v. Carpentier*, 80 Crim. 102 (E.D.N.Y. Dec. 1, 1980) (order granting applications to copy). *See also United States v. Haldeman*, 559 F.2d 31 (D.C. Cir. 1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977) (Watergate defendant).

We appreciate the sensitivity with which Judge Fullam approached the fair trial issue, since it demonstrates an acute awareness that defendants' due process right to a fair trial is the linchpin of our criminal justice system. Nonetheless, we must distinguish between those situations where there is hypothetical prejudice and those where it can be demonstrated that there has been actual prejudice caused by publicity. *Compare Chandler v. Florida with Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965).

As the Court noted in the *Chandler* case, "[a]ny criminal case that generates a great deal of publicity presents some risks that the publicity may compromise the right of the defendant to a fair trial." —— U.S. at ——, 101 S.Ct. at 809. There are, however, certain practical considerations that must be taken into account before finding that the possible effect of such publicity in a possible retrial warrants denial of access to evidence already introduced. Effectively, this would result in denial of the right to copy at a time when the issues remained a matter of public interest. Thus the educational and informational value of public observation of the evidence would never be available at a meaningful time. *See United States v. Mitchell*, 551 F.2d at 1261–62.

The decision of the Supreme Court in *Chandler* suggests that the appropriate course to follow when the spectre of prejudicial publicity is raised is not automatically to deny access but to rely primarily on the curative device of voir dire examination at the time of any possible retrial. The Court stated:

> Over the years, courts have developed a range of curative devices to prevent publicity about a trial from infecting jury deliberations. See, *e. g., Nebraska Free Press Association v. Stuart*, 427 U.S. 539, 563–565, 96 S.Ct. 2791, 2804–2806, 49 L.Ed.2d 683 (1975).

An absolute constitutional ban on broadcast coverage of trials cannot be justified simply because there is a danger that, in some cases, prejudicial broadcast accounts of pretrial and trial events may impair the ability of jurors to decide the

issue of guilt or innocence uninfluenced by extraneous matter. The risk of juror prejudice in some cases does not justify an absolute ban on news coverage of trials by the printed media; so also the risk of such prejudice does not warrant an absolute constitutional ban on all broadcast coverage. A case attracts a high level of public attention because of its intrinsic interest to the public and the manner of reporting the event. The risk of juror prejudice is present in any publication of a trial, but the appropriate safeguard against such prejudice is the defendant's right to demonstrate that the media's coverage of this case—be it printed or broadcast—compromised the ability of the particular jury that heard the case to adjudicate fairly.

—— U.S. at ——, 101 S.Ct. at 809. The district court here gave inadequate weight to the use of voir dire, the traditional method of protecting defendants from the adverse effects of publicity.

### 4. Concerns About Initial Admissibility of the Tapes

The district court expressed concern about the correctness of its initial decision concerning admissibility of the tapes which it weighed as another factor justifying denial of the broadcasters' application. The district court reaffirmed its original view "that the rulings were correct" but candidly stated that "the issue is certainly not free from doubt." 501 F.Supp. at 862. We will not reach to decide the substantive issue of the propriety of the original ruling on admissibility since it arises here only in a tangential proceeding but is likely to come before this court more directly on appeal from the convictions. Whatever the validity of the original ruling, the tapes were in fact admitted into evidence, their contents publicized, and the transcripts of the tapes released to the press. Thus, whatever privacy right defendants may have claimed in such tapes is irretrievably lost, and if any remedy remains, it must perforce be confined to appellate action with regard to the underlying conviction. It would unduly narrow the right of access were it to be confined to evidence properly admitted, since the right is based on the public's interest in seeing and knowing the events which actually transpired. Our prior comments distinguishing between defendants and innocent victims are also applicable in regard to this factor.

### 5. Tape Material As To Criden

A further factor referred to by the district court was that several portions of the videotape showing periods when Criden was alone in the room "snooping through the contents of the undercover agent's briefcase" were deemed admissible at the Schwartz-Jannotti trial but would not only be inadmissible in the Criden trial, but would be "devastatingly prejudicial" against him. 501 F.2d at 862. In view of the slim likelihood of any trial against Criden, see p. 825 supra, this factor loses much of the force attributed to it by the district court. Furthermore, the same voir dire protections referred to at p. 827 supra would also be available for Criden.

### 6. Analogy to Prohibitions Against Broadcasting Actual Trial

Another factor relied on by the district court was the prohibition by resolution of the Judicial Conference of the United States of the televising or other broadcasting of trial proceedings in the federal courts. The court found this relevant not only because such prohibition is directed to maintaining courtroom decorum or avoiding distracting influences, but also because such broadcasting "may affect the integrity of the trial process." The district court recognized the issue was pending before the Supreme Court at the time of its opinion.

As we have previously noted, following the district court's decision the Supreme Court ruled in the Chandler case that contemporaneous broadcasting of criminal trials was not unconstitutional and thereby alleviated, at least on a constitutional level, the concerns about the effect of possible nationwide broadcasting on the integrity of the trial process. Of course, the district

court is not precluded from considering that factor in reaching a discretionary decision on release of the tapes. However, we believe the district court failed to appreciate the basic distinction between the effect of a contemporaneous broadcast and the broadcast of tapes made before the trial. The Judicial Conference resolution is based on apprehension about the effect that contemporaneous broadcast of trial proceedings might have on the conduct of the trial itself. This cannot be a relevant factor when the material sought for copying is merely videotape of a preexisting event, since the participants on the tape cannot posture or otherwise change their behavior to play before a television audience.

### 7. *Scurrilous and Libelous Statements About Third Parties*

The district court stated that the evidence in the present case was distinguished from that in the Watergate litigation and the *Myers* case because "the tapes now under consideration are replete with scurrilous and libelous statements about third parties. I simply do not believe that a court should condone, much less affirmatively aid, the large-scale republication of such material." 501 F.Supp. at 862–63. As we have previously stated, courts may appropriately exercise their discretion to deny copying for rebroadcast of evidence which may inflict unnecessary and intensified pain on third parties who the court reasonably finds are entitled to such protection. Our review as to the strength of this factor in this case is hampered because the district court has failed to specify the nature of the offending statements or identify the persons concerned. For example, we do not know if the district court used the terms "scurrilous" and "libelous" as terms of art. They have different denotations. A "scurrilous" statement is generally considered to be merely "offensive" while a "libelous" statement is actionable. *See generally Tollett v. United States*, 485 F.2d 1087, 1092–96 (8th Cir. 1973). That which is scurrilous to one viewer may be shrugged off by another.

Under these circumstances, we believe it appropriate to remand this matter so that the district court can exercise its discretion to determine whether specific portions of the tapes merit excision. We are confident that the court will recognize that in view of our conclusion that there is no basis to withhold the right to copy the tapes in general, if any portion is deleted the broadcasters will be able to identify precisely which material has been deleted by comparing the transcripts of the evidence which they already have with the taped material to be made available to them. Therefore, excision might elicit comment on and reference to precisely the material which the district court would seek to protect. Nonetheless, the district court has some area of discretion in which to balance the strong public interest favoring access against legitimate privacy concerns of third parties. We therefore remand to the district court to consider, in light of this balancing, whether actual broadcast of videotape material is so likely to cause such serious harm to third parties that excision is warranted.

### IV.

■ We are cognizant that no two judges can accord precisely the same weight to the factors which enter into a discretionary decision. For the reasons we previously discussed, the trial court is generally given considerable leeway in the delicate balancing which must be performed. In this case, however, we conclude that the trial court accorded too little weight to the strong common law presumption of access and to the educational and informational benefit which the public would derive from broadcast of evidence introduced at a trial which raised significant issues of public interest. Similarly, the court accorded too much weight to concerns which we believe either are irrelevant or capable of resolution in some manner short of denial of the application. Accordingly, we believe that the application of the broadcasters should be granted, except for that material which the district court explicitly determines to be impermissibly injurious to third parties.

For the foregoing reasons, we will reverse the judgment of the district court and remand for further proceedings in accordance with this opinion.

WEIS, Circuit Judge, concurring and dissenting.

As the majority opinion admits, the right to copy court exhibits is not of constitutional derivation but springs from a common law tradition. The right is not unlimited, but as the parties concede, is a matter of trial court discretion. Thus, the broad statement in *Craig v. Harney*, 331 U.S. 367, 374, 67 S.Ct. 1249, 1254, 91 L.Ed. 1546 (1947), that "[w]hat transpires in a courtroom is public property" does not apply to the right to copy exhibits. Rather, as the Court said in *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598, 98 S.Ct. 1306, 1312, 55 L.Ed.2d 570 (1978):

> "It is uncontested ... that the right to inspect and copy judicial records is not. absolute. Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes."

The extended discussion of *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), in the majority opinion, albeit accompanied by disclaimers, has an unfortunate tendency to conjure up constitutional confusion about the right of access at issue here. *Richmond Newspapers* focused on a constitutional right to attend a criminal trial. The distinction between attendance at a trial and access to court records was addressed by the Supreme Court in *Nixon v. Warner Communications*. The Court made clear the difference between the right to obtain information placed in the public domain through disclosure at an open trial and the right to gather the same information by copying court records themselves. The issue was not whether the press must be "permitted access to public information to which the public generally is guaranteed access, but whether these copies of the White House tapes—to which the public has never had *physical* access—must be made available for copying." 435 U.S. at 609, 98 S.Ct. at 1318. Nor does *Richmond Newspapers* controvert the Court's statement in the *Nixon* case that "the requirement of a public trial is satisfied by the opportunity of members of the public and the press to attend the trial and report what they have observed." 435 U.S. at 610, 98 S.Ct. at 1318. That holding was referred to in *Chandler v. Florida*, —— U.S. ——, ——, 101 S.Ct. 802, 807, 66 L.Ed. 740 (1981), with no indication that it was affected in any way by *Richmond Newspapers*. Clarity therefore requires that the underlying premise in this case be stated once again. Access to court records is not a matter of constitutional right.

In determining whether records should be available for copying, the courts must weigh "the interests advanced by the parties in the light of the public interest and the duty of the courts." *Nixon v. Warner Communications*, 435 U.S. at 602, 98 S.Ct. at 1314. Factors such as an incremental gain in public understanding of an event and the presumption in favor of public access to court files weigh in favor of allowing copying. Counseling against access would be such matters as improper use, including publication of scandalous, libelous, pornographic, or trade secret material; infringement of fair trial rights of the defendants or third persons; and residual privacy rights.

The majority characterizes the presumption favoring access as "strong." I assume that the proof required to rebut a "strong presumption" is not as demanding as the showing necessary to come within the Second Circuit's exemption—"only the most extraordinary circumstances should prevent contemporaneous public access," *In re Application of National Broadcasting Company (Myers)*, 635 F.2d 945, 952 (2d Cir. 1980). Neither is the majority's test as stringent as the District of Columbia Circuit's—access should be denied only when " 'justice so requires,' " *United States v. Mitchell*, 551 F.2d 1252, 1260 (D.C.Cir. 1976).

To the extent that its opinion specifically rejected the extreme tests articulated by the Second Circuit and the D.C. Circuit, I agree with the district court. In reversing the *Mitchell* case, the Supreme Court pointedly declined to accept the D.C. Circuit's standard when it assumed the applicability of a "presumption—however gauged—in favor of public access to judicial records." 435 U.S. at 602, 98 S.Ct. at 1314. In any event, this court would be on much more solid footing if it declined to classify the presumption in terms of its strength, and simply left its existence as one factor to be considered.

The unique feature of this case is the district court's conclusion that the very great differences between videotapes and other forms of evidence pose different considerations. As the court phrased it,

> "Eyewitness testimony is often dramatic and convincing, but its effectiveness and convincing power are almost negligible in comparison with a film or videotape of actual events. When the videotape shows a crime actually being committed, it simply leaves nothing more to be said. This is all to the good, when the videotape is presented in evidence in the course of a trial. The jury is plainly entitled to the best and most reliable evidence available in its quest for truth."

The court expressed concern, however, that such powerful evidence can cause serious and irreparable harm to the judicial process and to persons who are entitled to protection.

It is true that a videotape of an event is far more accurate as to the events portrayed than the subsequent testimony of the most meticulous human witness, just as a videotape deposition is much more informative as evidence than the conventional stenographically recorded transcript. Nevertheless, courts and lawyers have traditionally placed heavy emphasis upon the written word and have been reluctant to change. The legal profession has been slow to accept modern and more accurate forms of communication, although it recognizes that the words used by a speaker are only part of the message. Lost in the written word are gestures, expressions, intensity of delivery, and other "body language" which convey more than the printed page can hold. Videotape depositions are slowly becoming common, but videotapes of trials made under court supervision have been utilized in only a few scattered instances. This reluctance lingers despite the great potential for furnishing a far more exact and enlightening record than the traditional transcript.

The fact that videotape evidence of an event is more reliable and convincing than a human being's imperfect description may indeed be a factor in a court's decision whether to release the evidence to the public. The videotape does not employ euphemisms but produces the truth in stark reality, sometimes so brutally as to be unsuitable for general audiences. As an example, a press representative in reporting a trial may adequately inform the general public about a challenged motion picture film by describing it as pornographic. It is not necessary that the film or excerpts be released for use in the evening TV news. Indeed, to permit such a showing under the guise of news would only thwart the laws prohibiting exhibition.

That trial court discretion is necessary to prevent excesses is demonstrated by *In re Application of KSTP Television*, 504 F.Supp. 360 (D.Minn.1980), where a commercial TV station sought release of videotapes showing conduct preliminary to, and in anticipation of, rape. The district court, in protecting the privacy rights of the victim, refused to release the tapes, despite the fact that they had been shown at trial and transcripts had been furnished to the media. The court rejected the contention that the television station had a right to copy and publicize the tapes, stating, "There must then come some point where the public's right to information must bow to the dignity of the individual person." 504 F.Supp. at 362.

The fact that a television station would seek to broadcast material of this nature is powerful justification for the principle that access to court records must be limited by judicial discretion. The KSTP incident may

also explain why states experimenting with the televising of trials leave to the trial judge's discretion the decision to exclude coverage of certain witnesses or portions of a trial. *See Chandler v. Florida,* —— U.S. at ——, ——, 101 S.Ct. at 805, 812. This discretion is compatible with that applicable when more traditional court exhibits are sought to be publicized. For example, gruesome or revolting photographs need not be released, and in most instances, dissemination of medical records would be an unwarranted affront to personal privacy.

In the case at hand, however, the unrelenting depiction in the evidence does not justify total denial of access to the videotapes. The negotiations for and bribery of governmental officials is a proper subject of public concern and reporting by the media. In this instance, the nature of the evidence is not such that vividity of the videotape in comparison to a witness's description of the occurrence is a reason for denial of access. Indeed, the inherent accuracy of the tapes may argue for their broadcast rather than less precise and comprehensive news reports.

A separate consideration present in this case is that there is irrelevant matter injurious to third parties on the tapes that merits consideration. The district court was concerned that copying would result in widespread dissemination of scurrilous and libelous statements about persons who were not parties and said, "I simply do not believe that a court should condone, much less affirmatively aid the large scale republication of such material." In this case, I would accept the trial judge's characterization of these statements without more and affirm his exercise of discretion in denying a copy of this objectionable matter.

That, however, does not mean that access to all of the material on the tapes should be barred. The privacy and reputation interests to which the trial court referred are legitimate ones, and there has been no showing by the petitioners of any overriding interest in televising those particular segments of the tapes. Technologically it is feasible for the trial court to redact copies of the tapes to remove objectionable comments without an undue expenditure of time or effort. The offensive remarks themselves unfortunately are already matters of public record, but there is no need for emphasis by leaving them in the tapes that will be shown to the television audience. Nor indeed have the TV stations shown any interest in broadcasting that material.

The trial court was also troubled by the possibility that, should a retrial become necessary, Schwartz and Jannotti could be prejudiced if the TV stations replayed the tapes. He commented that "the broadcasters can undoubtedly be relied upon to replay the tapes as part of their advance coverage of such trials." In this instance I agree with the majority that the likelihood that Schwartz and Jannotti would not have a fair trial is too speculative to rebut the presumption in favor of access.

As a practical matter, it must be recognized that if on appeal a new trial is ordered, considerable time will have elapsed before the case is again presented to a jury. The possibility of extensive television coverage of a retrial or of sustained public interest over that period of time is doubtful at best. So often newsworthy events greeted with excitement today only evoke ennui tomorrow.

I do not agree, then, with the trial judge's fear that the tapes will be replayed. Moreover, if they are broadcast, and the tapes themselves are again admitted, it would be difficult to establish that a prospective juror has been influenced simply because he has seen some part of the evidence in advance of trial. *Stroble v. California,* 343 U.S. 181, 191–95, 72 S.Ct. 599, 604–06, 96 L.Ed. 872 (1952); *see Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). Even if the video tapes are found to be inadmissible on retrial, it would not follow necessarily that testimony about the events shown on the tapes would also be excluded. If such evidence is introduced, the tapes might be found to be merely cumulative and, therefore, dismissal of a viewing juror might not be required.

In any event, the presumption in favor of public access to exhibits may be overcome on a showing that publication would deny a

fair trial to a defendant. That factor must be carefully weighed, and it must be recognized that not all publicity about a trial is prejudicial. It is worthy of note that in *Chandler* the Supreme Court said, "An absolute constitutional ban on broadcast coverage of trials cannot be justified simply because there is a danger that, in some cases, prejudicial broadcast accounts of pretrial and trial events may impair the ability of jurors to decide the issue of guilt or innocence uninfluenced by extraneous matter." *Chandler v. Florida,* —— U.S. at ——, 101 S.Ct. at 810. Although both constitutional and supervisory concerns are implicated in the circumstances here, I agree that the possibility of injury to Schwartz and Jannotti is too remote to prevail against the presumption of access.

I do not reach the same conclusion, however, in the Criden situation. The district court believed that admission of certain portions of the tape would be "devastatingly prejudicial" to Criden and therefore concluded that premature publication might interfere with his right to a fair trial.

There is a significant difference between the Schwartz-Jannotti and Criden situations. There has been a considered trial ruling by the district judge in Schwartz-Jannotti that the evidence was admissible. With respect to Criden, by contrast, there is the probability that some portions of the tapes will be excluded if the case is tried. The broadcast of inadmissible evidence immediately prior to trial and at a time when public interest is at its peak may deprive the defendant of a fair trial. *See Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963).

In the Criden situation, the respective interests may be weighed and a solution achieved by deleting those portions of the tapes that the trial judge is convinced would be inadmissible and pose a substantial threat to the right of a fair trial. As the majority opinion states, developments in Criden's case since the district court decided this matter may have eliminated the problem. Rather than ruling on the basis of incomplete information, however, I would remand to the district court for reconsideration in light of the changed circumstances and the possibility of redacting the tapes rather than prohibiting their use in toto.

Prejudicial pretrial publicity that jeopardizes a defendant's constitutional right to a fair and impartial jury is a continuing problem for the nation's trial courts. It is obvious that the courts cannot block publication of material that the press has obtained. This is so even though the frequent invocation of customary "remedies" for prejudicial publicity neglects to recognize that their use may deprive the defendant of valued constitutional rights, such as a speedy trial, a jury of the vicinage, or a jury representing a fair cross section of the population. The inability to limit prejudicial pretrial publicity, however, does not mean that the courts are bound to contribute to it.

In summary, I agree with the result reached by the majority, although I do not subscribe to all of the language used in the opinion. A proper purpose for access has been shown with the exceptions I have discussed, and therefore, the order should be vacated and the case remanded.