BECKER, Circuit Judge,
concurring and dissenting with respect to Parts I-V of the majority’s opinion, which primarily discuss the question whether the notification provisions of the challenged statute violate the Ex Post Facto Clause or the Double Jeopardy Clause; and concurring in Part VI of the majority’s opinion regarding the process due a registrant at a tier classification hearing.
*1112 TABLE OF CONTENTS
I.DO THE NOTIFICATION PROVISIONS OF MEGAN’S LAW
CONSTITUTE PUNISHMENT?.........................................1113
A. Introduction..........................................................1113
B. The History Subpart of the Artway Test; Overview.......................1114
C. Historical Analogues to Notification Provisions............................1115
1. The Applicability of Criden.........................................1115
2. Analogy to Shaming Punishments ...................................1115
3. Warning Posters, Wanted Posters, and Quarantine Notices Compared.... 1116
4. The Mechanism of Notification; Its Relation to the Choice of Historical Analogues.............................................1117
5. Summary: Shaming Punishments as the Best Analogy.................1119
D. Does the Text, Legislative History, or Design of the Notification Provisions Demonstrate That They are not Punitive?....................1119
1. Introduction; The Role of Law Enforcement..........................1119
2. Promoting the Aims of Punishment..................................1120
3. Excessiveness.....................................................1121
4. Summary of “Design”..............................................1122
E. Notification Fails the History Subpart of Artway..........................1122
II. EFFECTS...............................................................1122
A. Introduction..........................................................1122
B. Methodology: The Proper Standard for Evaluating Effects.................1123
C. Actual Effects........................................................1125
D. Summary............................................................1126
III. THE “CLEAREST PROOF” DOCTRINE...................................1126
IV. CONCLUSION...........................................................1128
The societal pressure for legislation designed to prevent terrible tragedies such as befell Megan Kanka and her parents is hydraulic. The pressure is understandable, for Americans are a fundamentally decent people, and legislation such as Megan’s Law is thus the product of good intentions. Unfortunately, however, earthly life is fraught with so much uncertainty that we cannot legislate against the vagaries of chance. In their desire to make everything right, legislators sometimes overlook this basic fact, and enact laws that not only fail to achieve their laudable ends, but also cause serious harm. This appeal involves a textbook example of that phenomenon.
I do not quarrel with much of what the majority has said in that portion of its fine opinion dealing with the definition of punishment. Importantly, I agree with its conclusion that our decision in Artway v. Attorney General of New Jersey, 81 F.3d 1235 (1996) remains viable even in the wake of Kansas v. Hendricks, — U.S. -, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), and United States v. Ursery, - U.S. -, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996), and that we must apply the Artway test for what constitutes punishment under the Double Jeopardy Clause and the Ex Post Facto Clause to determine the validity of the challenged statute. Where we part company is over the second prong of the Artway test — objective (legislative) intent, a consideration that is heavily freighted with history. History, a consideration deemed by the Supreme Court to be the barometer of legitimacy in so many constitutional cases, is telling in the resolution of this appeal.
Tacitly recognizing the deep, historic roots of the plaintiffs double jeopardy and ex post facto claims, the majority deftly tiptoes over the “stocks, cages, and scarlet letters referenced by appellants,” and asserts that other forms of the dissemination of information generated by our criminal justice system “constitute far more compelling analogies” to Megan’s Law. But the majority’s analogies are misplaced. Warning or wanted posters and quarantine notices provide very different information from that provided by the com *1113 munity notification provisions of Megan’s Law. Instead, the more apt historical antecedents to notification can be found in the shaming punishments of colonial America, which were indubitably and unabashedly punitive. Moreover, nothing in the design or operation of the notification provisions of Megan’s Law contradicts this historical understanding. Because the history of notification evidences an objective punitive intent, and because the design or operation of notification does not negate this objective intent, the notification provisions of Megan’s Law must be considered punishment under Artway’s second prong. I therefore dissent from the majority’s conclusion in Part V that Megan’s Law passes constitutional muster.
Failure to meet the second prong of the Artway test is fatal to the statute, and hence I do not ground my dissent on Artway’s third prong dealing with the “effects” of notification. However, because of the relevance of effects to application of the presumption in favor of subjective legislative intent over objective manifestations of that intent, and because of the general importance of the issue, which I think is much closer than the majority describes it, I report my conclusion that its treatment of the “effects” prong of Art-way is quite problematic. More specifically, its novel holding that nothing short of the deprivation of a sufficiently fundamental interest can give rise to an effect that would constitute punishment is, I believe, incorrect. Further, the majority improperly narrows the Artway effects test both procedurally and substantively.
I join in those parts of the majority’s opinion finding a Rooker-Feldman bar to our review of E.B.’s challenge, and declaring unripe the challenge to the state’s authority to dispense with notice prior to tier classification hearings in emergency situations. I also join in Part VI of the majority’s opinion holding that the due process clause forbids the imposition of the burden of persuasion at a Megan’s Law tier classification hearing on the offender and that that burden should be by clear and convincing evidence.
Finally, while I recognize that there is arguably a strong presumption favoring the subjective intent of a legislature in determining whether a measure is punitive such that only the clearest proof of objective intent will undermine that subjective intent, I believe that application of this standard in the present context is misplaced. The purpose of the standard is to determine legislative intent. There is thus no need to apply the standard here because the historical antecedents to notification provisions make that intent patent. Put slightly differently, assuming that such a standard does apply, I believe that the history of notification, the design of notification provisions in Megan’s Law, and the effects of notification provide sufficient proof to show an objective punitive intent, notwithstanding the subjective intent to the contrary. In other words, the objective manifestations of the legislative intent evidence a punitive purpose.
I. DO THE NOTIFICATION PROVISIONS OF MEGAN’S LAW CONSTITUTE PUNISHMENT?
A Introduction
The central issue in the case, as the majority’s opinion makes clear, is whether the notification provisions of Megan’s Law constitute punishment.[1] If not, then neither the Ex Post Facto Clause nor the Double Jeopardy Clause is implicated.
Like the majority, I believe that Artway provides the proper legal standard to govern whether notification is to be considered punishment. I join in its lucid explanation as to why the Artway test survives the recent Supreme Court cases in Ursery, and in Hendricks. I therefore turn to how the Artway test applies to the notification provisions of Megan’s Law. Because, as the majority explains, our conclusion in Artway that the *1114 actual purpose of the registration provisions of Megan’s Law is non-punitive effectively requires us to conclude that the actual purpose of the notification provisions is similarly non-punitive (satisfying Artway’s first prong), I proceed to Artway’s second prong.
B. The History Subpart of the Artway Test; Overview
I begin with the so-called history subpart of the objective purpose prong of the Artway test. Pursuant to this subpart, if historical analysis shows that the measure in question has been regarded as punishment, and if the text or legislative history of the measure does not negate this traditional understanding, we must consider the measure punitive. See Artway, 81 F.3d at 1263.
It is here that I most disagree with the majority’s opinion. In particular, I believe that it incorrectly frames the historical analysis, first by relying on immaterial precedent, and then by applying insufficiently comparable historical analogues to the notification provisions of Megan’s Law. A better reasoned analysis likens the notification provisions of Megan’s Law to the shaming punishments of colonial America — the scarlet letters of literary fame — leaving no doubt that the objective purpose of these provisions is punitive. The discussion may be put in proper perspective by looking at Supreme Court jurisprudence, and we do not have to look beyond a few of the Supreme Court cases decided in the last month of the October 1996 term. These cases are suffused by references to and reliance on historical analysis.
Perhaps the most apposite case is Hendricks itself, where the Court made use of the historical understanding of a measure to determine whether it was punitive. Holding that a Kansas civil commitment statute was not punitive, the Court noted that restricting the freedom of the dangerously mentally ill “is a legitimate non-punitive governmental objective and has been historically so regarded.” Hendricks, at -, 117 S.Ct. at 2083.
In Richardson v. McKnight, — U.S. -, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997), holding that prison guards employed by private prison management firms do not enjoy qualified immunity, the Court looked to the historical traditions of immunity applicable to privately employed prison guards, going so far as to examine the operation of jails in medieval England. Similarly, in Washington v. Glucksberg, — U.S. -, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997), canvassing the historical treatment of suicide and assisted suicide, the Court noted that “for over 700 years, the Anglo-American common-law tradition has punished or otherwise disapproved of both suicide and assisting suicide.” Id. at -, 117 S.Ct. at 2263.
In Printz v. United States, — U.S. -, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997), the Court relied heavily on history in analyzing the Brady Handgun Violence Prevention Act, surveying statutes and executive actions from the earliest days of the Republic to determine whether the federal government can constitutionally require states to execute federal regulatory laws. And, in Reno v. ACLU, - U.S. -, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), in striking down provisions of the Communications Decency Act of 1996, the Court looked to more modern history and distinguished the Internet from radio broadcasts, noting that the Internet has no history of limited First Amendment protections.
Although I have cited only a few examples, these recently decided cases make patent that history plays a vital role in constitutional adjudication. See John Paul Stevens, A Judge’s Use of History, 1989 Wis. L.Rev. 223, passim (suggesting that the interaction of history and the law is ripe for study and discussing the use of historical analysis in three cases).[2]
*1115 C. Historical Analogues to Notification Provisions
1. The Applicability of Criden
The majority’s treatment of history focuses first on United States v. Criden, 648 F.2d 814 (3d Cir.1981). There, we rejected a suggested analogy between the media rebroadeast of material placed into evidence at a criminal trial and the shaming punishments of colonial America. See id. 648 F.2d at 825. The majority essentially argues that the notification provisions at issue here are like the challenged re-broadcast in Criden. It reasons that, because the challenged re-broadcast is unlike the shaming punishments, the notification provisions must also be unlike them, and hence the purpose of the notification provisions does not correspond with the purpose of the shaming punishments. I believe that the majority’s reliance on Criden is misplaced. The notification provisions in Megan’s Law are different from the rebroadcast in Criden in a number of respects. The most striking is that the rebroadeast itself is carried out by the private media (who obtained the information from the state), whereas the notification provisions are carried out by the state.
This distinction makes all the difference. Here, New Jersey not only made the criminal history of convicted sex offenders publicly available, it also instituted an affirmative, state-run program to disseminate that information. In one imaginable scenario, New Jersey could simply have allowed private entities to disseminate this public information about the offender’s record. The state, however, chose to take the additional step of disseminating the information itself. The purpose of that deliberate decision is at issue here. To determine the objective purpose of the notification provisions, we must look to measures in which the dissemination of criminal history information is state-run, not to measures in which the dissemination occurs independently from state action. For the same reasons that Criden is inapposite, the majority’s discussion of public indictments, public trials, the public imposition of sentence, and “rap sheets” is unhelpful. In none of these cases is the state itself actively disseminating information.
2. Analogy to Shaming Punishments
In contrast, the state-run dissemination of criminal history information is central to the operation of shaming punishments.[3] As a result, shaming punishments are, as a group, measures that should be considered in our historical analysis. By shaming punishments, I mean a variety of punishments, common in the American colonies, ranging from the admonition to branding or maiming and banishment.
In an admonition, a magistrate or clergyman would lecture the offender privately about his misdeeds and seek his repentance. See Adam J. Hirsch, From Pillory to Penitentiary: The Rise of Criminal Incarceration in Early Massachusetts, 80 Mich. L.Rev. 1179, 1224 (1982). The offender would then offer a public apology before the community either in court, see id., or in church, see Toni M. Massaro, Shame, Culture, and American Criminal Law, 89 Mich. L.Rev. 1880, 1912-13 (1991). Once forgiven by the community, the offender was drawn back into its fold, thereby restoring a moral order upset by the offense. See id. at 1913. In a similar vein, offenders were often forced to stand in a public place for a time displaying their offense written on their clothing or on their bodies. See Lawrence M. Friedman, Crime and Punishment in American History 38 (1993). This public display took many forms in the colonies, and might include “[sjentences to the pillory, to the stocks, to lashes at the whipping-post, and to hours on the gallows with a rope around the neck.” Hirsch, supra, at 1225.
A court might also require that the offender permanently display a label representing his offense — for instance, a scarlet letter “A” for the crime of adultery. See Massaro, supra, at 1913. Such labels were generally cut *1116 from cloth and sewn on the offender’s outer garments. See Friedman, supra, at 40. Another form of permanent labeling was the brand, in which the authorities burned a label directly onto the offender’s body. See id. A murderer might be branded with an “M”, a thief with a “T”. See Jon A. Brilliant, Note, The Modem Day Scarlet Letter: A Critical Analysis of Modem Probation Conditions, 1989 Duke L.J. 1357, 1361. Colonial New Jersey, for example, punished burglary by branding the offender’s hand for a first offense, and his forehead for subsequent offenses. See id.
Mutilation or maiming was similar to branding except that it did not necessarily signal the precise offense the offender had committed. See Friedman, supra, at 40. A common form of mutilation or maiming was the detachment of an ear. See id. The effect of branding, mutilation, or maiming was often to cast the offender out of society once and for all. See Hirsch, supra at 1228. Unlike the aftermath of an admonition, the community did not welcome the offender back into society, but shunned him. See id. Just a short step away from branding, mutilation, and maiming, was banishment, a forced exclusion from the community. Banishment was reserved for those who presented “a permanent danger” or who engaged in “repeated criminality.” See Friedman, supra, at 40. “Those who would not repent, those who could not be regathered into the bosom of society, had to be driven out.” Id.
These various punishments were effective — they had “sting” — because each punishment publicized accurate information about the offender’s misdeeds, and because of the cultural milieu of a colonial settlement. A settlement in the American colonies was “small-town life at its most communal.” Id. at 37. Thus, once an offense had been made public, the entire community became aware of it, and such publicity was the cause of shame. In addition, colonists have been described as ultra sensitive to criticism from their fellows, see Massaro, supra, at 1912, especially from those whom they knew and respected, see Hirsch, supra, at 1233-34. Therefore, the public dissemination of the fact that a community member had committed some offense was especially calculated to provoke shame in the wrongdoer.
As the majority recognizes, these shaming punishments often were imposed in addition to physical punishments, such as whippings. See Friedman, supra, at 40. However, the physical punishment did not lessen the “sting” associated with the public dissemination of the offense. See Hirsch, supra, at 1232 (“A sentence to whipping or the pillory had worked primarily through the media of psychic pain and shame.”). In fact, the physical punishment was seen as being effective only insofar as it resulted in the offender being shamed by the publicity of his offense. See id. at 1233-34 (“As the aura of shame and psychic trauma surrounding the penalty evaporated, there was left behind only a small core of physical pain quite insufficient to prevent offenses.”). Further, the authorities often dispensed with physical punishments altogether because the “sting” associated with the publicity was more sharp. See id. at 1226. Finally, some shaming punishments had no physical components at all; for instance, those condemned to display a label representing their offense did not necessarily suffer physical punishment.
3. Warning Posters, Wanted Posters, and Quarantine Notices Compared
As the foregoing discussion makes clear, shaming punishments are analogous to the notification provisions contained in Megan’s Law. But that does not end our inquiry. Other measures also rely on the state dissemination of information. The majority mentions two such measures: warning or wanted posters, and quarantine notices.[4] The question, then, is whether the notification provisions of Megan’s Law are more like the shaming punishments or more like warning or wanted posters, or quarantine notices. The difficulty in pinpointing the proper historical analogy to notification provisions lies *1117 in identifying the characteristics of such provisions (in addition to the state dissemination of information) that will help us to determine their objective purpose. This analysis is further complicated, at least in part, by the fact that “[unquestionably punitive statutes share traits with laws that are universally accepted as [remedial].” Note, Prevention Versus Punishment: Toward a Principled Distinction in the Restraint of Released Sex Offenders, 109 Harv. L.Rev. 1711, 1725 (1996).[5]
The majority ignores an important component of the shaming punishments when it reasons that warning or wanted posters and quarantine notices are more apt analogies to notification provisions than are the shaming punishments. The majority essentially believes that the characteristic that notification provisions share with warning or wanted posters and with quarantine notices (and the characteristic that is sufficient warrant to justify its analogy) is the general type of information that each measure disseminates. In other words, it reasons that, because notification provisions alert the community to a risk, they must be akin to warning or wanted posters and to quarantine notices which similarly alert the community to a risk.
The problem with this reasoning is that— like the warning or wanted posters, and quarantine notices — the shaming punishments also alerted the community to a risk, the risk that the offender would re-offend. See, e.g., Hirsch, supra, at 1228 (“Less common, but equally effective, were branding and mutilation, punishments that fixed upon the offender an indelible ‘mark of infamy,’ to warn community members to keep their distance.”); Massaro, supra, at 1913 (“Branding and maiming also were designed in part to prevent the offender from committing future similar acts, either by warning future victims of their criminal propensities or by disabling the offender.” (footnote omitted)).
Moreover, notification is a judicially endorsed pronouncement that the registrant presents a danger to the community. In that sense, notification is closer to the shaming punishments than to warning or wanted posters, or quarantine notices. There is no judicial involvement in the issuance of warning or wanted posters, or of quarantine notices. Judicial endorsement, by a disinterested magistrate, is different in kind from a determination by other public agencies. Therefore, one cannot contend that warning or wanted posters and quarantine notices are better analogies to the notification provisions than are the shaming punishments simply because warning or wanted posters and quarantine notices alert the community to a risk.
New Jersey argues that, because the purpose of the notification provisions and that of measures such as warning or wanted posters, or quarantine notices is to alert the community to some danger (a remedial purpose), we must consider notification provisions historically analogous to these other measures. As the foregoing discussion suggests, this argument is flawed. The goal of the history subpart of the Artway test was to determine the objective purpose of a particular measure by examining the historical understandings of analogues to the measure in question. It does not comport with this methodology to choose as data points historical analogues based solely on the claim that they served the same purpose as the measure in question. To do so would assume the very issue that is in dispute, and then reach a conclusion by way of circular reasoning.
4. The Mechanism of Notification; Its Relation to the' Choice of Historical Analogues
Because we are concerned with the objective purpose of the state dissemination of *1118 information, we must examine the particular information the state chooses to disseminate in order to determine that objective purpose. As the majority describes the process of notification, New Jersey provides recipients of notification with the following information: the identity of the convicted sex offender, his physical description, the location of his dwelling, the place of his employment, a description of his automobile, his license plate number, and the offense(s) for which he was convicted and by which the notification was triggered.[6]
This is the same type of information the state disseminated in carrying out the shaming punishments. Because the offender would have been well known to those who witnessed the shaming punishment, simply by placing the offender on display before the community was enough to disseminate his identity, his physical description, the location of his dwelling, and the place of his employment.[7] In fact, the shaming punishments became less frequent when such information could not be conveyed by public display alone. See Hirsch, supra, at 1228-34 (describing the decreased use of shaming punishments as colonial communities grew in size thereby increasing the likelihood that the offender was a stranger to the witnesses of his punishment); see also Dan M. Kahan, What do Alternative Sanctions Mean?, 63 U. Chi. L.Rev. 591, 631 (1996) (“Early Americans turned to imprisonment in large part because they believed that existing criminal penalties had lost the power to shame.”).[8] Moreover, as noted above, central to many of the shaming punishments was some notice— e.g., a sign, a label, or a brand — of the offense(s) for which the offender was being punished.
In contrast, warning or wanted posters and quarantine notices do not disseminate the same type of information disseminated by notification provisions. A warning or wanted poster, displayed in an effort to catch escaped prisoners or to arrest alleged criminals, obviously does not include information about the location of the offender’s current dwelling, nor of his current employment. If the authorities had this information, they would know how to apprehend the offender. Such posters also typically include information about the facts of the individual’s escape in the case of a warning poster, and the facts of the individual’s alleged crime in the case of a wanted poster. Quarantine notices, too, include information different from that included in notification provisions. The most prominent difference is that quarantine notices include health-related information; such notices make no mention of criminal or alleged criminal activity. Information provided pursuant to notification, then, links the registrant to some act for which he is blameworthy. Health related information is normally not related to culpability.
The state attempts to distinguish the notification provisions from the shaming punishments in terms of the scope of the notification. New Jersey makes much of the fact that the notification provisions, unlike the shaming punishments, do not involve the dissemination of information to the entire community. I believe that the state overstates the significance of this difference. Though notification under both Tier 2 and Tier 3 is intended to be limited, the design of the provisions seems to encourage more widespread dissemination. Tier 3 recipients are not warned that the information is confiden *1119 tial. Tier 2 recipients are so warned, but I fail to see how that warning is to be taken seriously. Under Tier 2, notification is given to the staff of organizations charged with the care or supervision of children and/or women. Such notification would effect the remedial purpose of the statute — the protection of the children and women under the care of the organizations — only if the organizations pass the notification information to the children and women under their care.
New Jersey also emphasizes that notification is tailored to the specific offender and may not occur at all. In emphasizing this aspect of notification, the state fails to appreciate fully the textured nuances of the shaming punishments. Shaming punishments were also tailored to the specific offender and often did not occur at all. For instance, permanent labeling and branding were reserved for offenders whose likelihood of re-offense was high. See Friedman, supra at 40. Only the “deep-dyed sinner” would suffer such a fate. Id. Further, shaming punishments were by no means automatic; not all offenders would be so punished. Fines or bonds for good behavior (payments made to the authorities that were forfeited should the surety commit a misdeed within a certain time period) were common punishments for lesser offenses. See Hirsch, supra at 1224. And, even for more serious offenses, an offender could often simply pay a fine and avoid a shaming punishment altogether. See Friedman, supra at 38 (describing the punishment for a woman who struck her husband as either half an hour at a town meeting with her offense written on her forehead or the payment of a fine to the county).
5. Summary: Shaming Punishments as the Best Analogy
In sum, the foregoing analysis demonstrates that the closest historical analogues to the notification provisions of Megan’s Law are the shaming punishments, which were traditionally considered punitive.[9] Like the shaming punishments, notification is carried out by the state. In that sense, notification is unlike measures in which the state merely allows private individuals or entities to access information and then allows those individuals to release that information more broadly. Moreover, like the shaming punishments, notification provides the community with information about the registrant’s identity and physical description, place of residence, place of employment, and criminal history. Such information is judicially endorsed. The information provided by notification is different from that provided by warning or wanted posters, which do not provide information about residence and employment, and quarantine notices, which do not provide information about criminal history; none of this information is judicially endorsed. Above all notification is the functional equivalent of shaming punishments; notification publishes information about the registrant calculated to reach the entire community and likely to lead to public opprobrium.
D. Does the Text, Legislative History, or Design of the Notification Provisions Demonstrate That They are not Punitive?
1. Introduction; The Role of Law Enforcement
Under Artway, the notification provisions must be considered punishment provided the text or legislative history does not demonstrate that they are not punitive. I therefore turn to the question whether the text or legislative history so demonstrates. This part of the analysis requires an examination of the actual operation or design of the measure at issue. See Hendricks, at 2080, 117 S.Ct. at 2080-85 (examining the design of the Kansas civil commitment statute). It is an inquiry focused on the question whether the *1120 legislature designed the statutory scheme in such a manner so as “to contradict the historical understanding of [the measure] as punishment.” Austin v. United States, 509 U.S. 602, 619, 113 S.Ct. 2801, 2810, 125 L.Ed.2d 488 (1993).
Perhaps the most striking feature of the statutory design is its placement of the tier classification determination and of the notification process squarely within the criminal justice system. The chapter that contains the registration and notification provisions is contained in the state’s Code of Criminal Justice. Cf. Hendricks, at -, 117 S.Ct. at 2080-82 (relying in part on the decision by the state of Kansas to place its Sexually Violent Predator Act within the probate code, instead of the criminal code, to conclude that the challenged measure was not a criminal proceeding). It is the Attorney General of New Jersey, a law enforcement officer, who is charged with “promulgat[ing] guidelines and procedures for the notification required” by Megan’s Law. N.J. Stat. Ann. § 2C:7-8(a) (1995).
The guidelines are to be formulated with the advice of a “notification advisory council” comprised, at least in part, of professionals from various fields outside of official law enforcement, but the professionals are all involved, at least to some degree, in the criminal justice system, broadly defined, and this council provides, as its name suggests, mere recommendations. See id. § 2C:7-11. Once in place, the guidelines are to be implemented by the county prosecutors: they determine the risk that a particular offender poses for re-offending, thereby setting the tier classification, and they determine the means of providing notification. See id. § 2C:7-8(d).
As the guidelines are currently written, the county prosecutors have significant leeway both in determining the appropriate tier classification and in fashioning the proper notification plan. Application of the Registrant Risk Assessment Scale is by no means ministerial; the county prosecutors must determine whether the particular offender poses a low, moderate, or high risk to the community for each factor in the Scale. Although the Scale provides guidance to the prosecutors making this determination, it does not eliminate from the process prosecutorial evaluation. The guidelines allow prosecutors to enlist the assistance of persons outside the prosecutor’s office, such as social workers or psychologists. However, the guidelines leave formulation of the notification to the considered judgment of the county prosecutors. It is up to those law enforcement officials to ensure that the notification is properly tailored to reach those at risk of being victimized by the particular offender.
Finally, law enforcement officers, whether of the municipality in which the offender intends to reside or of the state police force, provide the actual notification. See id. §§ 2C:7-6, 2C:7-7.
2. Promoting the Aims of Punishment
The operation of the statute will, moreover, promote “the traditional aims of punishment — retribution and deterrence.” Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168, 83 S.Ct. 554, 567, 9 L.Ed.2d 644 (1963); see Hendricks, at -, 117 S.Ct. at 2082 (“As a threshold matter, commitment under the Act does not implicate either of the two primary objectives of criminal punishment— retribution or deterrence.”). Of course, simply because a measure has the effect of promoting retribution and deterrence does not necessarily mean that its purpose was to do so. See Artway, 81 F.3d at 1255. Still, such an effect suggests that the particular measure was not designed in a way that contradicts the historical understanding of its analogues as punitive. That the notification provisions of Megan’s Law promote retribution and deterrence is demonstrated as follows.
By publicizing an offender’s crime to the community, notification realizes justice, see id. (explaining that retribution “does not seek to affect future conduct or solve any problem except realizing ‘justice’ ”), in that it inflicts suffering on the offender. It is undisputed that notification results in shaming the offender, thereby effecting some amount of retribution. This suffering “serves as a threat of negative repercussions [thereby] discouraging] people from engaging in cer *1121 tain behavior.” Id. It is, therefore, also a deterrent. There is no disputing this deterrent signal; the notification provisions are triggered by behavior that is already a crime, suggesting that those who consider engaging in such behavior should beware. See Doe v. Pataki 940 F.Supp. 603, 623 (S.D.N.Y.1996) (“The Act is designed in such a fashion as to suggest that it is punitive. It contains classic indicia of a punitive scheme. Its provisions are triggered by behavior that is ‘already a crime.’ ”).
3. Excessiveness
The design inquiry is also furthered by an analysis of whether the notification provisions are excessive in relation to their stated remedial purpose. In a several important respects, they are. First, the criminal acts that, pursuant to Megan’s Law, trigger registration and potentially subject an offender to notification, are over-broad. For example, kidnapping, even without a concomitant sexual offense, triggers notification, see N.J. Stat. Ann. § 2C:13-l(c)(2)(c); so, too, does consensual sexual contact that is criminalized merely because of the age of one of the participants, see, e.g., id. § 2C:14-2(a)(l), (b), (c)(5). See Doe v. Pataki, 940 F.Supp. at 623-24 (describing New York’s Megan’s Law as excessive because it covers individuals such as a “21-year old who engages in sexual intercourse with a 16-year old (who is not a spouse),” a person who engages in incest, and a person who restrains another under the age of 17); Kansas v. Myers, 260 Kan. 669, 923 P.2d 1024, 1042-43 (1996) (describing Kansas’s Megan’s Law as excessive because “[sjeveral of the listed felonies [triggering registration and notification] include what otherwise might be viewed as voluntary sexual contact between two persons that is considered criminal because of the minority status of the victim and the fact that the victim is not married to the accused”).
Next, notification under Tier 3 is often provided to those who simply do not need to know that there is a released sex offender nearby. Tier 3 notification is to be provided to “members of the public likely to encounter the person registered.” N.J. Stat. Ann. § 2C:7-8(c)(3) (1995). But the “likely to encounter” standard does not limit notification to vulnerable populations. It is a standard based largely on geographic proximity, see Doe v. Poritz, 142 N.J. 1, 662 A.2d 367, 385 (1995), rather than whether the recipient of notification needs protection (e.g., a child) or can protect others (e.g., a parent). Under the statute, a move by a registrant into a retirement community will trigger notification of his neighbors.[10]
Similarly, the type of information required to be provided by the guidelines is excessive; it is information individual recipients often simply do not need to know. Individuals who receive notification learn of an offender’s place of residence and his place of employment, regardless of their relative locations. If an offender does not work at a location near to his place of residence, which I suspect is not uncommon, then such information is only in part useful for protection. A recipient of notification who lives, attends school, works, or is otherwise located near to an offender’s place of residence should be little concerned about the location of the offender’s place of employment (and vice versa). Knowing the offender’s place of residence might lessen the risk that the recipient will become a victim of the released offender; he or she can avoid the offender’s house, for example. But, knowing the offender’s distant place of employment offers no protective assistance to the recipient. If the person is not likely to encounter the offender at the *1122 offender’s place of employment (or place of residence), why would he or she need or want to know such information?
4. Summary of “Design”
In sum, the design of the notification provisions does not contradict the historical understanding of analogues to such provisions as punitive. Notification is placed in New Jersey’s- criminal code and is structured and carried out by state law enforcement officials. Further, notification promotes the aims of retribution and deterrence. Finally, in important respects, notification is excessive. The particular recipients who receive notification and the type of information they receive are not carefully tailored to the remedial goals notification is intended to serve.
E. Notification Fails the History Subpart of Artway
As the foregoing discussion makes clear, the proper historical analogues to the notification provisions of Megan’s Law are the shaming punishments of colonial America. Clearly punitive, such punishments evidence an objective punitive purpose for the notification provisions. The design of the notification provisions — especially the placement of the provisions in the state criminal code and the placement of the responsibility of enforcing them with law enforcement officials, the excessiveness of their operation, and their promotion of retribution and deterrence— does not negate this objective punitive purpose. Therefore, I believe Megan’s Law fails the history subpart of the second prong of the Artway test and should be considered punishment. As a result, the judgment of the district court should be reversed. This conclusion is buttressed by my discussion infra at Part II.C. of the extent to which, by reason of the network of Megan’s Laws throughout the nation, notification is akin to banishment, another traditional colonial measure in the nature of punishment. See supra, at Part I.C.2.[11]
II. EFFECTS
A. Introduction
The final prong of the Artway test concerns the actual effects of the challenged measure. According to Artway, “[i]f the negative repercussions — regardless of how they are justified — are great enough, the measure must be considered punishment.” Artway, 81 F.3d at 1263.[12] The analysis required under this part of the test is one of degree, and is guided by the signposts of already decided cases. See id.
The conclusions I have already reached— that Megan’s Law fails the objective purpose prong of the Artway test and must, therefore, be considered punitive — might make it unnecessary for me to reach the “effects” issue. However, because of the relevance of the effects to application of the clearest proof standard on which the majority relies, see infra Part III, because I believe that the majority’s effects analysis is seriously flawed, and also because the enormous importance of the case counsels that I explain why, I discuss the effects of the notification provisions. *1123 As I will demonstrate, the majority, in undertaking its own analysis, narrows the test fashioned in Artway. It does so without support, and, given the tenor of the analysis, unnecessarily. I also identify problems with its substantive discussion.
B. Methodology: The Proper Standard for Evaluating Effects
To begin, I quote from the majority’s opinion: “It necessarily follows that some limit must be placed on the situations in which a measure’s sting alone, despite its remedial purpose and effect, will constitute punishment under those clauses and that classification as punishment on the basis of sting alone must be reserved for cases involving deprivation of the interests most highly valued in our constitutional republic____ Interests such as these are sufficiently fundamental to our constitutionally secured liberty that state interference with them can be justified only by the most important of state interests.” With the second sentence, the majority states that the line marking the boundary between a non-punitive and a punitive measure varies according to the remedial interest sought to be served by the measure. In other words, it appears that the majority is holding that the more important the remedial interest served by a particular measure the more harsh the sting of the measure’s effects may be before the measure is classified as punitive. Nothing in Artway (or, for that matter, in the Supreme Court jurisprudence on which it draws) suggests such a formulation of the effects prong. To the contrary, Artway posits that a particular sting either falls on the punishment side of the line or it does not. At issue here is the particular sting, not the particular remedial interest.
The majority has thus introduced a diffieult-to-apply sliding scale into an already complex test. This needless complication would render it nearly impossible to determine whether a particular sting is punishment. For example, as we know from Hawker v. People of State of New York, 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002 (1898), the revocation of a license to practice one’s profession is not considered punishment. However, could such a revocation be punishment if the remedial interest served by the challenged measure is relatively unimportant? If so, at what point does the importance of the remedial interests render such a revocation non-punitive? Under the majority’s reading of Artway, an analysis of the effects prong requires a two-track inquiry, guided only by a few fixed points. I fear that this amorphous inquiry might lead to an elusive or protean jurisprudence, something to be avoided.
Moreover, because the other prongs of the Artway test adequately stir into the mix the remedial interests served by the particular measure, we need not examine those interests under the effects prong. The actual purpose prong examines whether the legislature subjectively intended the measure to advance remedial interests. All three sub-parts of the objective purpose prong require the reviewing court, to some degree, to consider the remedial interests the legislature subjectively believed it was advancing by enacting the challenged measure. Considering the stated remedial purpose under the effects prong might overemphasize that stated purpose, thereby potentially allowing diversion of attention from the actual operation of the measure.
The majority also narrows the Artway test by requiring that, at a minimum, a challenged measure act to deprive affected persons of a sufficiently fundamental interest before that measure is considered to cause punitive effects. The majority offers no support for this proposition in either logic or precedent, and I am unaware of any. Nothing in Artway (or, for that matter, in the Supreme Court jurisprudence on which it draws) suggests such a formulation of the effects prong. In addition, at least as I read the majority’s opinion, defining the effects prong in this manner is unnecessary to the result. The majority apparently believes that the effects caused by notification simply are not harsh enough to classify Megan’s Law as punitive. Under my reading of Art-way, satisfaction of the effects prong does not require overcoming such a difficult hurdle.
I am especially concerned in this regard because of the indefiniteness of the majori *1124 ty’s formulation. It is not apparent to me what would constitute a “sufficiently fundamental interest.” Furthermore, without a clear understanding of those interests the deprivation of which might constitute punishment, I am also unsure as to whether the majority adequately defines the universe of interests that it, or I, would deem worthy of protection. In short, I fear that the majority might have left too little room to deal with unforeseen cases in this difficult area of jurisprudence.
In addition to re-formulating the Artway test, the majority also treats the effects of notification in such a manner as to minimize the impact of those effects. First, it emphasizes that the effects of which the offenders complain — e.g., isolation, public humiliation, loss of employment opportunities, and physical violence — are indirect. Although I agree that such is the case, I remonstrate against what seems to be overemphasis upon that aspect of notification for, in itself, indirectness of effects is not dispositive.
The Supreme Court addressed the question of directness in California Department of Corrections v. Morales, 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995), the very case on which Artway bases the effects prong of its test. The Court struggled with the question whether a change in the procedures governing parole suitability hearings would effect an impact on a prisoner’s expected term of confinement. See id. at 506-14, 115 S.Ct. at 1602-05. In concluding that the measure did not constitute punishment, the Court determined that the changes in the relevant procedures “create[d] only the most speculative and attenuated possibility of producing the prohibited effect of increasing the measure of punishment for covered crimes.” Id. at 509, 115 S.Ct. at 1603. The Court made plain, however, that even the indirect effects of a measure could render it punitive.
Here, the indirect effects of notification are neither “speculative” nor “attenuated.” In fact, notification advances the stated remedial purposes of Megan’s Law only insofar as it induces many of these indirect effects. For example, public safety is enhanced if potential victims of an offender are warned to avoid him, thereby isolating him from the larger community. If the legislature were not aware that at least partial isolation would necessarily result from notification, I doubt that it would have believed that notification would serve the remedial purposes it sought to advance. And, although not necessarily vital in ensuring the efficacy of Megan’s Law, other indirect effects — e.g., harassment, loss of employment opportunities, and physical violence — surely were anticipated as also being inevitable. New Jersey was not the first state to adopt notification provisions, and the experiences of other states must have informed the New Jersey legislature as it considered Megan’s Law.
In other states, notification has caused harassment, loss of job opportunities, and the like. A study by the Washington State Institute for Public Policy, released in December 1993 (approximately ten months prior to the enactment of Megan’s Law), reported numerous instances of harassment following notification in Washington, some quite severe, under its 1990 Community Protection Act. See Sheila Donnelly & Roxanne Lieb, Community Notification: A Survey of Law Enforcement 7 (1993). In short, most of the indirect effects of notification are expected and foreseeable.
The second manner in which the majority minimizes the impact of the effects of notification is by separating the analysis into two distinct parts. It first examines the effect of notification on the reputational interests of the offender; then it examines the effect of notification on the increased risk of physical violence. The majority concludes that each of these effects, by itself, does not produce a sting harsh enough to classify notification as punishment. It fails, however, to determine whether these effects, if examined together, are sufficiently harsh. The difference between these two approaches is manifest. Individual effects each might produce only a moderate sting; adding together these little stings might, however, produce a great big sting. In the real world, it is the total sting that the recipient feels. It is not clear why the majority chose not to add these stings together. And, at least from my reading of Artway, there is no justification for choosing not to do so. Rather, I believe that Artway *1125 (and Morales) require an analysis of all the effects of a measure, provided they are not too speculative or attenuated, and here they are not.
C. Actual Effects
Turning from methodology to substance, I first note my agreement with the majority’s identification of the effects caused by notification as including isolation, harassment, loss of employment and housing opportunities, damage to property, and physical violence.[13]
As is clear from the majority’s description of the effects of notification, the burden imposed by the collective weight of all of these effects is borne by the offender in all aspects of his life. At worst, the offender is literally cut off from any interaction with the wider community. He is unable to find work or a home, cannot socialize, and is subject to violence or at least the constant threat of violence. At best, he must labor within significant confinements. Although perhaps some people will hire him or rent him a home, his social intercourse with others is all but nonexistent. The effects of notification permeate his entire existence. See Doe v. Gregoire, 960 F.Supp. 1478, 1486 (W.D.Wash.1997) (“[H]ere the punitive effects are dominant and inescapable.”); Roe v. Office of Adult Probation, 938 F.Supp. 1080, 1092 (D.Conn.1996) (“Notification is an affirmative placement by the State of a form of public stigma on Roe, and this stigma by its very nature pervades into every aspect of an offender’s life.”). And, although the majority’s opinion is eminently fair, I think that it understates the effects of notification provisions. Throughout the nation, there are continual reports of harassment, threats, isolation, and violence. In the margin, I mention some of the most recent occurrences.[14]
Although the question is very close, I believe that there is a strong argument that the harshness of the effects of notification are closer to imprisonment and revocation of citizenship than to a loss of a profession or of benefits. Like imprisonment and the revocation of citizenship, notification is all-pervasive. In that sense, the offender has almost no refuge from the sometimes severe effects of notification. He may seek to move to another state, but the majority of states has some form of community notification. He could, perhaps, move out of the country to avoid this network of domestic Megan’s Laws. At the extreme, then, notification has become, at least for that offender, akin to banishment. See Doe v. Pataki, 940 F.Supp. at 626 (“Notification statutes have resulted in the banishment of sex offenders both literally and psychologically.”). This pervasive aspect of notification differentiates it from the loss *1126 of employment opportunities and the loss of benefits.[15]
Perhaps the most difficult question in this context is whether notification is fairly considered punishment when civil commitment— a form of involuntary confinement — is not. In Hendricks the Supreme Court held that a state statute allowing the confinement of convicted sex offenders after the expiration of their prison term did not constitute punishment. Important to the Court was the traditional understanding of civil commitment as non-punitive. But beyond that distinction, I note two respects in which notification under Megan’s Law may be considered more harsh than the civil commitment statute at issue in Hendricks.
First, anyone confined under the Kansas statute was afforded some form of treatment if such was possible. See Hendricks, at -, 117 S.Ct. at 2082-85. No such treatment is available to those subject to notification under Megan’s Law, and there is at least some evidence in the record that the isolation engendered by notification may in fact cause some offenders to recidivate. See Prentky Aff. ¶4, Appellants’ App. at 189; see also Doe v. Pataki, 940 F.Supp. at 628. Thus, the effects of civil confinement might be rehabilitative, while those of notification are exactly the contrary. Second, the Kansas statute required a yearly reevaluation of the confined offender. See Hendricks, at -, 117 S.Ct. at 2082-84. The registration and notification provisions in Megan’s Law are applicable for at least fifteen years. See N.J. Stat. Ann. § 2C:7-2(f) (1995). It is possible, then, that the sting of notification will last far longer than that of civil commitment.
D. Summary
In sum, although I do not rely on my analysis of the effects prong of the Artway test to support my ultimate conclusion, I note that the majority’s discussion of effects is seriously flawed in terms of both procedure and substance, casting further doubt upon the judgment and shoring up still further my dissenting posture. The majority improperly and unnecessarily narrows the effects prong of Artway by requiring that a measure deprive an individual of a constitutionally secured fundamental right and by examining the effects in isolated groupings. Finally, its substantive discussion of actual effects is, in important respects, flawed.
III. THE “CLEAREST PROOF” DOCTRINE
The majority’s most serious challenge to my position inheres in its argument, citing Hendricks and referring to Ursery, that only the “clearest proof’ will negate legislative intent to deem a measure non-punitive. In terms of the Artway test, then, the majority effectively holds that should a measure be considered non-punitive under the test’s first (actual purpose) prong, then there is a strong presumption that the measure is non-punitive, and only the clearest proof as to the second (objective purpose) and third (effects) *1127 prongs of the test will overcome that presumption. I am unpersuaded. First, the etiology of the “clearest proof’ doctrine is such that I doubt that the Supreme Court would apply it in this context with such clear and direct historical antecedents, so plainly punitive in character, to the community notification provisions of Megan’s Law. Second, even if the standard were applied here, I believe that the historical context of notification, the design of Megan’s Law, and the effects resulting therefrom, provide sufficiently clear proof of objective intent to negate remedial purpose.
The clearest proof standard was first articulated in Flemming v. Nestor, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). In Flemming, the Supreme Court addressed a contention that the legislative history and design of a statute that allowed the Secretary of Health, Education, and Welfare to terminate Social Security benefits payable to aliens deported due to their political affiliations evidenced a punitive congressional intent that negated a stated remedial intent. The Court stated:
We observe initially that only the clearest proof could suffice to establish the unconstitutionally of a statute on such a ground. Judicial inquiries into Congressional motives are at best a hazardous matter, and when that inquiry seeks to go behind objective manifestations it becomes a dubious affair indeed. Moreover, the presumption of constitutionality with which this enactment, like any other, comes to us forbids us lightly to choose that reading of the statute’s setting which will invalidate it over that which will save it.
Id. at 617, 80 S.Ct. at 1376.
The Court has since employed the clearest proof standard in at least six cases. In Communist Party of the United States v. Subversive Activities Control Board, 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961), the Court considered whether, despite manifest congressional intent to the contrary, a measure was actually intended to outlaw the Communist Party. The Court stated that only the clearest proof would negate that congressional intent. In United States v. Ward, 448 U.S. 242, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980), the Court required the clearest proof that, despite the manifest intent to create a civil proceeding, a fine under the Federal Water Pollution Control Act was nevertheless a criminal proceeding. In United States v. One Assortment of 89 Firearms, 465 U.S. 354, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984), and in Ursery, the Court applied the clearest proof standard to determine whether civil forfeiture statutes were punitive. Examining the Illinois Sexually Dangerous Persons Act, the Court in Allen v. Illinois, 478 U.S. 364, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986), stated that only the clearest proof would negate the legislative intent that proceedings determining whether an individual should be committed to psychiatric care were civil in nature. Finally, and most recently, in Hendricks, the Court used the clearest proof standard in the context of a challenge to a civil commitment statute.
Although the Supreme Court has repeatedly applied the clearest proof standard in the context of challenges alleging that subjective legislative intent is different from objective legislative intent, I am unwilling to apply the clearest proof standard in this context, at least until the Supreme Court makes it clear that doing so is appropriate. The clearest proof standard creates a nearly irrebuttable presumption that favors subjective legislative intent over objective manifestations of that intent. In an excess of caution, I eschew exploration of the extent to which such a presumption can create incentives for legislatures to obscure their actual intent with subjective intent, rendering it unwise to employ it in certain circumstance. The purpose of the “clearest proof’ exercise is to provide a technique to determine legislative intent. This technique is unnecessary here, where, as I have explained, notification measures are so plainly the direct descendants of historical punitive schemes. It seems to me, moreover, that something more than subjective intent alone must be shown to abrogate the historical understanding that notification measures are punitive. In other words, a legislature’s simply denying that it is operating outside of a shared cultural tradition does not make it so.
*1128 This argument may be illuminated by flipping the coin over, as it were, and looking at the issue by assuming that the clearest proof standard applies in this case. In such event, I believe that such proof exists. At the threshold, I warn against placing too much emphasis on the meaning of “clearest proof.” As Flemming and its progeny make patent, the standard is intended as a kind of warning to the federal courts to give legislatures the benefit of the doubt. It is thus consistent with familiar canons of statutory interpretation and constitutional adjudication stating that legislatures are rational bodies that intend to function within their powers to enact lawful measures. In cases in which there is little doubt, however, there is no benefit to give.
Here, there is little doubt. As Part I.C. makes clear, notification measures have historically been considered punitive. As Part I.D. makes clear, the particular design of notification under Megan’s Law in no way contradicts this history. And, as Part II makes clear, the effects of notification measures suggest strongly their punitive nature; the majority’s efforts to dilute the Artway effects prong, see supra Part II, are unavailing. Taking the foregoing factors together, then, I conclude that sufficient proof of an objective punitive intent motivating the notification provisions of Megan’s Law exists to negate the subjective remedial intent.
IV. CONCLUSION
We should and do endeavor mightily to protect our children from the dangers of the modern world. There is, however, a background risk of violence from which we simply cannot shield them. I believe that the New Jersey legislature desperately wanted to do all that it could to prevent the murder of any child at the hands of a released sex offender. But, if a released sex offender is intent on repeating his offense, there is no reason to believe he will necessarily limit himself to his surrounding community (or, for that matter, limit himself to his state).
Unfortunate though it may be, dangers to our children can come from anywhere. People in the community, especially parents, therefore justifiably warn children more sternly about interacting with strangers, wandering too far from home, staying out past dark, etc. There is no way to determine how many crimes will be prevented by all of the Megan’s Laws throughout the country. I suspect, however, that the change in protection secured by notification will be marginal at best. Query whether this marginal change is worth tampering with “an essential thread in the mantle of protection that the law affords the individual citizen.” Lynce v. Mathis, — U.S. -, -, 117 S.Ct. 891, 895, 137 L.Ed.2d 63 (1997) (discussing that group of constitutional provisions protecting against the retroactive application of new laws).
It is instructive to note that this issue bears a similarity to the challenge the Supreme Court recently faced in Reno v. ACLU, - U.S. -, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). There, underlying the Court’s decision to strike down key provisions of a statute purporting to rid the Internet of obscenity is the notion that vital constitutional protections must not be swept away in the understandable fervor to protect our children. Basic constitutional rights fundamental to ordered liberty, like the freedom of speech and the right to be free from the retroactive application of the laws, impose on each of us certain burdens. We will remain a free people only so long as we accept those burdens, even in the face of the very safety of our children. Recognizing the rights of released sex offenders, unpalatable though that may be, is one of them.
Although I am outvoted on the double jeopardy/ex post facto issue, I am at least comforted by our holding that the notification machinery, with all of its attendant consequences, will not be triggered without the significant safeguard of requiring the state to establish the case for notification by clear and convincing evidence.

. As the majority notes, Megan’s Law was actually a series of bills enacted by the New Jersey legislature. Hereinafter, when I refer to Megan’s Law, I refer only to those provisions requiring released sex offenders to register with law enforcement officials so that such officials may, in certain circumstances, carry out community notification as to the whereabouts of these offenders. These provisions are codified in the New Jersey Code of Criminal Justice at § 2C:7-1 through § 2C:7-11.

. Were I to conduct a more extensive canvass of the extent to which the Supreme Court relies on history in constitutional cases, this opinion would become a veritable treatise. The Court’s long line of media access cases, beginning with Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), which traces the history of open criminal trials from the days before the Norman Conquest, is but one example.

. That the form of dissemination under Megan’s Law (written notice) is different from the form of dissemination of the shaming punishments (public display of the offender) is immaterial. Public display in modem society simply would not accomplish the goals of notification; not all those “likely to encounter" the released offender would be notified by public display.

. In a footnote, the majority mentions common procedures that provide for public notice that an inmate is being considered for parole or is being released from incarceration. Such measures are relatively modem and therefore are probably not appropriate historical analogues to the notification provisions, and I will not dwell on them any more than the majority does.

. My analysis here mirrors that explained in an article describing the process of legal reasoning by analogy. See Scott Brewer, Exemplary Reasoning: Semantics, Pragmatics, and the Rational Force of Legal Argument by Analogy, 109 Harv. L.Rev. 923, 965 (1996). To quote from the author:
[I]n order for an argument by analogy to be compelling ... there must be sufficient warrant to believe that the presence in an "analogized” item of some particular characteristic or characteristics allows one to infer the presence in that item of some particular other characteristic.
Id. (footnote omitted). In this case, we are attempting to determine which characteristics of notification will allow us to infer its objective puipose by examining analogues of notification that share these characteristics and whose purpose we know.

. I rely here on the type of information released pursuant to the Attorney General’s guidelines implementing notification. See N.J. Slat. Ann. § 2C:7-8(d) (1995). I assume that the guidelines accurately reflect the legislative purpose in this respect.

. Contrary to the majority’s assertions, there is no evidence of which I am aware that a colonial settlement would have known prior to the shaming itself of an offender’s crime. I suspect that if the community was already aware of the crime, then shaming punishments would be unnecessarily duplicative.

.In an interesting, perhaps ironic twist, the need for notification provisions arises because of the "anonymity afforded by modem society.” Recent Legislation, 108 Harv. L.Rev. 787, 790 (1995) (discussing the Washington state sex offender notification statute). Piercing the veil of modern anonymity may serve remedial purposes, such as alerting the community to the risk that a convicted sex offender who resides nearby may re-offend, but it also may serve punitive purposes, such as providing the community a target for harassment.’

. It is interesting to note that in recent years courts nationwide have returned to versions of the colonial shaming punishments. See Kahan, supra, at 631-34. Courts might require individuals to wear t-shirts or bracelets announcing their crime, to post placards on their houses or bumper stickers on their cars, to stand in public places wearing signs, or to apologize publicly to the community or their victims. See id. at 632-34. The actual, stated purpose of these measures is punitive; in that sense, they differ from Megan's Law. However, these measures suggest a shared cultural understanding, still prevalent in our society, that publicity concerning an individual’s misdeeds can, and often is, intended to punish that individual.

. The guidelines written to implement Megan's Law may be interpreted to warn against this very problem. They suggest that the law enforcement officials responsible for implementing the notification tailor such notification so that it reaches only those at risk. However, the examples provided by the guidelines suggest limitations on the type of recipient organizations, not on recipient individuals. Moreover, the guidelines stress that, notwithstanding this suggested tailoring, geographic proximity remains the critical factor in determining the scope of notification. Additionally, once the information is released, there is no practical means of limiting its further distribution. See Kansas v. Myers, 260 Kan. 669, 923 P.2d 1024, 1041 (1996) ("The print or broadcast media could make it a practice of publishing the list [of released sex offenders] as often as they chose. Anyone could distribute leaflets containing the registered information anywhere and anytime.'').

. Because of my conclusion as to the history subpart of the Artway test, I need not examine in detail the other subparts of the objective purpose prong of the test. I mention them here only briefly. First, though it is a very close question, I doubt that the notification provisions of Megan's Law, as I have described their design, can be explained solely by a remedial purpose. Second, because, as I have discussed, the traditional understanding of historical analogues to the notification provisions and the design of Megan's Law evidence an objective retributive purpose, the third subpart of the objective purpose prong is not implicated. In other words, the third sub-part of the objective purpose prong applies only "if the legislature did not intend a law to be retributive but did intend it to serve some mix-lure of deterrent and salutary [remedial] purposes.” Artway, 81 F.3d at 1263. Here, such a retributive purpose existed.

. Holding that the retroactive cancellation of early release credits earned by prison inmates violated the Ex Post Facto Clause, the Supreme Court examined the actual effect of the legislation at issue without concern for the stated legislative purpose. See Lynce v. Mathis, - U.S. -, -, 117 S.Ct. 891, 896-98, 137 L.Ed.2d 63 (1997). In so doing, the Court reaffirmed its approach in California Department of Corrections v. Morales, 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995), on which Artway based the effects prong of its test. See Lynce, at -, 117 S.Ct. at 897.

. I recognize that analysis of the notification provisions presents potentially difficult causation questions. For example, given that criminal history information is publicly available, it is not clear whether the harassment to which a released offender might be subject is caused by government notification or by the general availability of such information. It could well be that (and the record indicates instances in which) a community becomes aware of the presence of a released offender through the media. That said, the very fact that the state believes it important to notify persons about the location of a sex offender could both drive these media reports and spur local communities into action. In such event, notification could be characterized as a cause of these effects.

. In California, where the information about released sex offenders can be accessed on CD-ROM, a released offender’s car was fire-bombed. See Carolyne Zinko, Flyers Falsely Call Artist a Molester, S.F. Chron., July 14, 1997, at Al. Reaction to notification is often swift; another report from California notes that a neighborhood organized a protest within one day of receiving notification in order to drive the released offender from the community. See Bonnie Hayes & Frank Messina, New Turn Out for Megan’s Law Viewing in O.C., L.A. Times, July 2, 1997, at Al. Further, the community reaction does not easily wane. In New York, two neighbors of a sex offender protested in front of his house for months in an effort to force him to leave. See Today (NBC television broadcast, June 24, 1997). Even those who have endeavored to help reintegrate released sex offenders into the community have been thwarted; in some areas, local churches have been unable to assist offenders because individual congregants have made it impossible for the offenders to stay in the flock. See Lisa Richardson, Megan’s Law is Put to Test as Towns Bounce Child Molesters, L.A. Times, May 25, 1997, at A3. In fact, so potent a weapon is notification, that there are reports of false notifications, presumably initiated by private individuals intent on carrying out a personal vendetta. See Zinko, supra, at A1.

. In both De Veau v. Braisted, 363 U.S. 144, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960) (plurality opinion), and Hawker v. People of State of New York, 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002 (1898), the Supreme Court held that the loss of certain employment opportunities did not constitute punishment. However, the loss of such opportunities was limited; in De Veau, the relevant statute forbade a felon from work as a union official, see De Veau, 363 U.S. at 145, 80 S.Ct. at 1147, and in Hawker, the relevant statute forbade a felon from practicing medicine, see Hawker, 170 U.S. at 190, 18 S.Ct. at 574. In neither case did the statute limit all employment opportunities.
In Flemming v. Nestor, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960), the Supreme Court held that the loss of social security benefits did not constitute punishment. In the context of the particular statute, however, the sting of that loss is not as sharp as might be supposed initially. First, the spouse of the beneficiary might still be eligible for benefits. See id. at 606 n. 2, 80 S.Ct. at 1370 n. 2. Second, the loss is triggered by deportation from the United States. See id. at 604-05 & n. 1, 80 S.Ct. at 1369-70 & n. 1. There is no indication whether the deportee might be eligible for similar benefits in the country to which he is deported. Thus, the loss of social security benefits in this context does not necessarily render the affected individual destitute or without assistance; he has other places to turn.
In a similar vein, we have recently held that the eviction of a tenant from public housing because of a drug offense is not punitive, see Taylor v. Cisneros, 102 F.3d 1334, 1341-1344 (3d Cir.1996), but such an eviction did not prevent the affected individual from obtaining housing elsewhere.